### FLEER CORPORATION

v.

### TOPPS CHEWING GUM, INC. and Major League Baseball Players' Association.

Civ. A. No. 75–1803.

United States District Court,
E. D. Pennsylvania.

June 30, 1980.

Matthew Strickler, Linda S. Martin, Robert J. Lewis, Philadelphia, Pa., for plaintiff.

Sidney Harris, Washington, D. C., for Topps.

Donald Fehr, New York City, for Major League Baseball Players Assoc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

Topps Chewing Gum, Inc., is the sole significant manufacturer and seller of baseball cards in the United States. Fleer Corporation, a competing bubble–gum manufacturer, has sued under the antitrust laws to obtain the right to sell baseball cards in competition with Topps, alleging that Topps and the Major League Baseball Players Association have unlawfully restrained trade in baseball cards. After trial of the action, the Court has determined that Topps and the Players Association have restrained trade in the baseball card market in violation of § 1 and § 2 of the Sherman Act. The Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a), F.R.Civ.P.

## FINDINGS OF FACT

1. The plaintiff, Fleer Corporation, is a Delaware corporation whose principal place of business is Pennsylvania. The company manufactures bubble gum, candy, toys and novelties primarily for sale to children.

2. Topps Chewing Gum, Inc., one of the two defendants in this case, is a New York corporation with offices in New York City. Its principal manufacturing and distribution facility is in Duryea, Pennsylvania. Topps, like Fleer, manufactures bubble gum, candy and novelties primarily for sale to children.

3. Defendant Major League Baseball Players Association is a labor organization whose primary responsibilities are to negotiate, administer and enforce collective bargaining agreements reached with baseball team owners on behalf of the players.

4. This is an antitrust action brought by Fleer against Topps and the Players Association. Fleer alleges that Topps and the Association have monopolized and unlawfully restrained trade in baseball cards in violation of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

5. Topps is the only significant seller of baseball cards in the United States. It is the only company that sells baseball cards in the form with which the public is most familiar--a package of about ten baseball cards containing one piece of bubble gum. (P–241).[1]

---

1. At different points in its Findings of Fact the Court has noted one or more exhibit numbers which support a given finding. The Court has made no attempt to cite exhibits for every or even most findings, nor is it intended that a citation to an exhibit summarizes all of the

6. Topps's best–known product is "Bazooka" bubble gum, but the company also produces a great variety of other products. Those products include "Garbage Candy" (candy sold in a miniature plastic garbage can); "Crunchy Lunch"; "Ring Pop"; "Krypton Gum"; and a variety of editorial (non–sports) trading cards such as "The Incredible Hulk"; "Charlie's Angels", "Superman", and others.

7. Topps also manufacturers and sells football cards, basketball cards and hockey cards, which like baseball cards are sold only in the part of the year during which a given sport is played.

8. In 1978, Topps's total domestic and foreign sales were about 67 million dollars. Fleer's total sales were about 15.2 million dollars.

9. Fleer's best–known products are "Dubble–Bubble" bubble gum, and "Gator-gum", a soft chewing gum that is designed to help quench thirst. The company has also marketed products such as "Fireplugs", "Mr. Bones" (hard candies in a plastic coffin), and "Bubble Burger" (bubble gum shaped like a hamburger), among others.

*The Contracts*

10. Since 1966, Topps has entered into a baseball card contract with virtually every new player entering professional baseball at either the minor or major league level.

11. Every contract between Topps and a player is and has been on a standard form contract (P–54, P–55, P–56), which grants Topps the exclusive right to sell that player's name and picture "alone or in combination with chewing gum, candy and confection, or any of them", for the first five baseball seasons in which that player is in the major leagues, no matter when those seasons occur.

12. Topps's form contract forbids a player from granting to another *any* of the rights covered by the contract before that contract expires. As a result, competitors are not able to secure baseball card rights from players for a period beginning at the expiration of the Topps contract. The best that a competitor can do is to solicit an agreement that the player will not renew his contract with Topps, which would give the competitor an opportunity to make an offer for the rights at the expiration of the Topps agreement.

13. It has been and remains Topps's practice to renew its contracts with major league players every other year. Renewals are for two year periods, and are solicited by Topps sometime before opening day, whenever a player has less than five (i. e. four) seasons remaining on his contract with Topps. Virtually all major league players sign such renewals. As a result of the renewals, about 50% of the players (at the beginning of the season) are obligated to Topps for five playing seasons, and about 50% (at the beginning of the season) are obligated to Topps for six playing seasons.

14. In 1966, the Players Association hired Marvin Miller as its first full–time executive director. Mr. Miller's background is in labor relations, and he assumed his position primarily to organize the players' collective bargaining efforts. However, upon his arrival in 1966 he found that the Association was facing a temporary financial emergency.

15. The Association needed funds to pay for its new office space in New York City, and to pay the salaries of a small staff of three or four persons. The solution that Mr. Miller devised was to finance the Association's activities through a group licensing program with the Coca–Cola Company. Coca–Cola wanted to place a series of pictures of 500 major league players on the inside of its bottlecaps, and it asked the Association to obtain the necessary authorizations from the players. The Association did so, Coca–Cola paid the Association for those rights, and the funding crisis was resolved.

evidence in support of a finding. The sole purpose of citing exhibits is in some way to simplify the task of the parties and our brethren in the appellate courts who may be required to review this massive record in the course of an appeal.

16. After the Players Association began to collect membership dues, it decided to return licensing income to the players. The Coca–Cola license was such a success that the Association decided to continue group licensing on a routine basis. Miller originally conceived the group licensing effort as a stop–gap funding effort, but the players were so pleased with the income that it generated, that they insisted on retaining it on a permanent basis.

17. The commercial authorization is a contract by which each player grants the Players Association the exclusive right to use his picture, name and signature with other players in a group. In turn, the Association grants exclusive group licenses to various merchandisers. (P–8).

18. Virtually every player now in the major leagues is a party to a commercial authorization. The standard commercial authorization is distributed to the players in spring training with an Association dues check–off authorization. The commercial authorization has a three year term. Renewals are obtained by a team's player representative, i. e. the player on a team who acts as the union's "shop steward". The record is silent as to how often renewals are obtained, but it is apparent, first, that many players sign at the same time, as part of a group; second, that the player representative determines when renewals are appropriate; and third, that renewals are not necessarily obtained near the end of a player's three–year term.

19. The standard commercial authorization reads in pertinent part as follows:

"[T]he undersigned hereby exclusively authorizes the Major League Baseball Players Association to market rights, together with other Major League players as a group, to the use of his name, picture (still photographs, motion pictures or television, except for Club publicity purposes) and signature. It is understood that such rights will be sold for the players as a group on an exclusive basis and shall not involve a personal endorsement by any individual.

It is also understood that monies received by the Major League Baseball Players Association for the sale of such group rights will be used to defray the cost of operation of the Players Association and that such monies will be credited to the undersigned individuals as dues paid to the Association.

Any monies earned from the sale of such group rights which exceed the budget of the Association shall be distributed among all members of the Association who have authorized the sale of such rights.

Any group licensing contract entered into with an individual company for the promotion of its products, shall exclude players who are committed by contract to competitive products. In the event any such company is interested in securing a personal endorsement, it is understood that such endorsement will require the personal approval of the individual involved and a separate payment directly to him.

This authorization shall be for a three year period."

20. The Players Association construes its commercial authorizations to mean that a merchandiser cannot negotiate individually with players to obtain a group of contracts. Topps and bat and glove manufacturers are not subject to that interpretation because they contract individually with players for endorsement or marketing rights while the players are still in the minor leagues. Virtually all players therefore sign their first commercial authorizations *after* they are already under contract to Topps and the glove and bat companies.

21. *On many occasions between 1971 and 1976 the Players Association advised persons or companies who engaged in direct solicitation of marketing rights from players that the Association is the exclusive agent for group licenses for all major league players, and that those persons or companies should desist from direct solicitation of the players.* (Miller Dep. 346).

22. In late 1974, Topps advised the Association that a Michael Aronstein was solicit-

ing players for baseball card rights. The Association wrote Aronstein a letter which said in part:

"It has come to [our] attention that you have been soliciting major league players, coaches and managers to grant permission to have their pictures used in connection with a baseball card collector set. The Major League Baseball Players Association is the exclusive assignee of the players, coaches and managers with regard to their property rights in connection with group promotions and group commercial endeavors. A project such as yours cannot be undertaken without a license to do so from the Players Association. In any event, however, a license cannot be granted to you since Topps Chewing Gum, Inc. is by contract our exclusive licensee for baseball cards either sold alone or together with confectionary products. In addition, the individual players, managers and coaches have contracts with Topps granting that company the exclusive rights noted above.

You are hereby instructed to cease and desist from all your activities in this regard. Should you fail to do so immediately, we will bring an appropriate action for damages and injunctive relief." (P–62).

23. The Players Association holds all of the rights that are available to license a non–confectionary baseball card product, since the Association's contracts with its members prevent a competitor from engaging in direct solicitation of contracts from the players. Moreover, the Association has an extraordinary degree of cooperation from its members in the licensing area, and is able to enforce its rights.

24. The major leagues are an open shop. Major league players are not required to join the Players Association. Nevertheless, only three active major league players have declined to join the Association in the past 13 years.

25. In late 1966, Marvin Miller met with the president of Topps, Joel Shorin, to discuss the terms of Topps's contracts with the players. Miller was concerned that the players were not receiving sufficient compensation for the rights they were granting.

26. At that time, Topps paid each minor league player $5.00 for his signature on an initial contract, and $125.00 for each season he was in the major leagues for 31 days, or for any year in which his picture was used in a baseball card series. Topps paid no royalty. Miller told Shorin that Topps's contracts were unfair to the players; Shorin disagreed.

27. Miller and Shorin continued their discussions, but Topps was unwilling to give up any of its rights. During a meeting among Marvin Miller, Joel Shorin and a prospective licensee of the Players Association, Shorin refused even to define the limits of Topps's rights. Topps nevertheless threatened legal action if those rights were infringed. (P–15)

28. In February of 1968, Miller related the difficulties he had been having with Topps to the Executive Board of the Players Association. (The Executive Board is the Association's governing body. It consists primarily of designated player representatives). The Executive Board voted to recommend that Association members–virtually all major league baseball players–cease renewing their individual contracts with Topps. That recommendation was accepted, and very few players signed renewals with Topps. Realizing that Topps faced a formidable opponent in the Association, Shorin contacted Miller to determine if an end to the dispute could be negotiated.

29. As negotiations began, the Players Association demanded a uniform expiration date for all of Topps's contracts; an agreement that the Association would at some point offer the rights on a bid basis; a limitation on Topps's rights to sell baseball cards "alone"; and more money for the players.

30. Topps offered only more money. The Players Association threatened to persuade the players to enter into agreements with it not to renew their contracts with Topps. (P–21)

31. Shorin and Miller met again on April 23, 1968. At that time, Shorin gave Miller a legal memorandum that stated that the Association's group licensing program violated the antitrust laws. (Miller Dep. 232–233). Shorin also tried to persuade the Association to make a joint statement to the players that Topps's new money offer and proposed contract were fair. (P–24)

32. The Association, in turn, believed that Topps's contracts with the players violated the antitrust laws, and Richard Moss, counsel to the Association, so advised Shorin.

33. The Players Association submitted a counter–proposal in the form of a contract between Topps and the Association. The proposal suggested higher royalties and a uniform expiration date for Topps's contracts.

34. Negotiations between Topps and the Players Association continued. By late September, 1968, Topps and the Association had reached tentative agreements on most issues.

35. On November 19, 1968, Topps and the Association entered into an eight page contract which provided as follows:

(1) All contracts between Topps and major league players were amended to increase the payments to individual players from $125 per year to the greater of (i) $250 per year, or (ii) a pro rata share of 8% of Topps's sales up to $4,000,000 and 10% of Topps's sales in excess of $4,000,-000;

(2) Major league players were guaranteed royalties equal to those paid by Topps to professional football players for the use of their pictures on football cards.

(3) Pictures 5″ × 7″ or larger with a sale price of 25 cents or greater were excluded from Topps's rights, except that Topps retained a right of first refusal as to any such merchandising proposal;

(4) The Association would not "interfere with the Topps contracts, its procurement of such contracts or its policy during the existence of this Agreement."

(5) Topps would advise the Association as to whether Topps would release its rights under its contracts with the players to permit the Association to license any proposal which otherwise infringed Topps rights. (P–1)

36. In 1973, Topps and the Association extended their royalty agreement for an additional five year period, i. e. from 1976 to 1981.

### Fleer's Standing

37. In September of 1974, Donald Peck, the president of Fleer, approached Marvin Miller of the Players Association about Fleer's obtaining a license from the Association. Fleer sought a license to market 5″ × 7″ satin patches, to be sold at 25 cents each, picturing active major league players.

38. Fleer sought a license for a 5″ × 7″ product because that was the only type of product resembling baseball cards that it believed the Players Association might be willing to license.

39. Fleer had a number of discussions about the 5″ × 7″ proposal with representatives of the Players Association. Marvin Miller called Topps to determine whether Topps would exercise its right to market the product (derived from its right of first refusal). Topps declined to do so. Fleer's offer included a $25,000 guarantee and a royalty of 15% on sales.

40. The Executive Board of the Players Association refused to license Fleer's proposal. Its principal reason for doing so was its fear that Fleer's product would remain unsold on store shelves, prompting store owners to cut back on orders of Topps's baseball cards until the 5″ × 7″ items were sold. (TR 2397–98) The Players Association receives substantial income from sales of Topps's baseball cards, and it did not want to jeopardize that income by licensing the Fleer proposal.

41. Had the agreement between Topps and the Association not existed, the Fleer 5″ × 7″ proposal might have been accepted, since Mr. Miller, at least, was at first receptive to the proposal. (TR 154, 157–8).

42. Fleer's 5" × 7" proposal was a serious one. Fleer would have marketed the product had it obtained a license to do so. The defendants' arguments that the proposal consisted merely of four lines drawn on a piece of paper and that it was an artifice to permit Fleer to obtain standing for an anti-trust suit simply are not supported by the record.

43. Fleer currently has (and, as of 1974, had) production machinery with which to manufacture baseball cards. It also manufactures low cost novelties. It has shown that it has the ability to finance production and sale of a wide variety of low cost gum, candy and novelty products. Had Fleer chosen, it could have made a credible bid on some form of baseball card rights.

44. Fleer had some experience and background in the baseball card business. During 1963, it marketed baseball cards with a cookie, and at one point in the 1960's it had entered into non–exclusive contracts with more than 3,000 professional baseball players. (In 1966, Fleer sold those rights to Topps for $395,000.) In the 1970's, Fleer began to market (and still markets) team logos (insignia), in the form of "stickers", under license from the major league baseball club owners' licensing group.

45. Fleer has desired to enter the baseball card market since at least 1968. (The defendants very much dispute whether Fleer made serious *efforts* to enter the market). Fleer has "intended" to enter the market since at least 1974 when it made its 5" × 7" proposal.

46. In April of 1975, Fleer asked Topps to waive its exclusive rights so that Fleer could pursue a license to sell stickers, stamps, and decals depicting active major league players. Topps refused to do so.

*Relevant Market*

47. In 1978, the standard Topps baseball card package consisted of 14 baseball cards and a slab of gum weighing 4.30 grams. The normal retail price was 20 cents per package.

48. Topps's baseball cards are 2½" × 3½" in size. Most of the cards have a name and picture of a single player, in team uniform, on the front, and career statistics and personal information (height, weight, age, how he bats and throws) on the back. Other cards show groups such as "all–stars" or "rookies"; pictures of teams; managers; and series "checklists" which permit collectors to keep track of their acquisitions.

49. Topps's baseball cards are marketed each year in series. That is, only 100 or so of the 600–700 cards are released at a time. The process of releasing series continues throughout the spring until all of the cards are available. The series concept stimulates collecting. Players are mixed in the packages at random, with no divisions by team, league, position, etc.

50. Boys, age seven through twelve, are the primary consumers of baseball cards in the United States. Boys not in that age group, girls, and adults also buy some baseball cards.

51. In 1978, sales of Topps's baseball cards with gum in the primary twenty cent package accounted for $6.6 million in sales out of Topps's total baseball card sales of $9.2 million. $2.6 million dollars of sales were achieved with products such as "Rack–packs" (a large number of baseball cards sold alone) and 500–card vending packs.

52. Topps's Proposed Finding No. 242 is accurate. "Children buy Topps' baseball cards to obtain both the cards and the bubble gum, but it is the cards they want most. Children in one study felt that the gum in editorial card packs was less desirable than bubble gum sold alone, but said they may chew it anyway. Thus, the gum is also an important part of the package in that it also serves as a treat or attraction."

53. Topps's baseball cards are sold primarily in convenience stores, discount stores, and small local grocery stores. Most baseball card purchasers buy their cards from convenience stores, such as "7–11" stores.

54. Baseball cards are usually sold on the candy and gum rack of a convenience, variety or grocery store.

55. Convenience, variety, discount, and similar stores typically offer a wide range of products on their candy and gum shelves, or in their candy and gum sections. This range of products includes bubble gum, regular chewing gum, candy of all kinds, and novelty and low cost toy items such as candies in toy containers, stickers, decals, iron–on and stick–on patches, trading cards, etc. A candy rack usually includes many items, only one of which is baseball cards. Most of the items on such a rack are priced in the 15–50 cent range.

56. A wide variety of trading cards are currently being sold. Topps, the Donruss Company, and Fleer publish a variety of trading cards, usually sold with gum, featuring characters, celebrities, symbols, scenes and stories drawn from television shows, motion pictures, musical groups, professional sports, and other activities.

57. With few exceptions, editorial (non sports) cards rarely sell for more than one, or at most two, years. Editorial card series are usually based on short--lived popular interests–"fads"–such as movies and television shows. The normal editorial card series contains only 66 cards, and there are not usually convenient units, such as professional sports teams, to serve as goals for collectors.

58. Sports cards, especially baseball cards, are perennial favorites. The popularity of baseball cards has spanned many decades, and the yearly changes in a player's career statistics, as well as trades to different teams, guarantee that each year's series holds new interest for the collector.

59. Baseball cards have been marketed in very large (600–700 card) series. Consumers who are interested in collecting are able to make purchases over many weeks without completing the series.

60. Trading, collecting and learning about players are the most common reasons for children to purchase baseball cards. Editorial cards are purchased primarily because of the appeal of the subject matter, which is presented in a variety of entertaining ways, e. g. action pictures, satire, etc.

61. Topps's baseball cards are sold to wholesalers from February through August, although a sharp drop in sales occurs in May. Topps's football cards are sold from August through November; Topps's hockey and basketball cards are sold from October through January.

62. Baseball cards are most often sold with a premium–Topps's bubble gum–but, occasionally, baseball cards are sold *as* a premium. For example, baseball cards have, in the past decade, been sold with cereal, cupcakes, candy and hamburgers. Baseball cards sold as premiums are difficult to collect as a series because of the cost of the underlying products.

63. A variety of low cost novelty items which have "play value" may be found on a typical candy rack. "Container" candy ("Fireplug", "Mr. Bones", "Pez", etc.), editorial trading cards, bubble gum, carbonated candy, iron- -ons, and baseball cards all satisfy a child's desire to play (and often to eat at the same time.) Broadly speaking, most novelty items compete with most other novelty items for a child's money.

64. Baseball cards are by far the most consistent trading card item (in terms of sales) sold in the United States. The record shows only one example of a trading card product having achieved more sales than baseball cards (in 1973–74); that item was called "Wacky Packages". In 1976, Baseball card sales accounted for about 46 percent of all trading card sales (exclusive of hockey, basketball and football cards). In other years, baseball cards have garnered about one third of all such sales. (P–380).

65. The level of public perception of baseball cards as a distinctive product is high. Baseball cards are viewed by consumers and the public as "baseball cards" more than as a sub–species of trading cards, or as a novelty. They are, in fact, viewed as a separate market.

66. Baseball cards have a number of peculiar uses. They are used for trading in

childhood simulations of actual player trades in the major leagues. Also, baseball cards are collectable in a way that distinguishes them from other trading cards. The buyer of editorial cards (e. g., "Superman" cards), has only an arbitrary number of cards as a goal for his collecting (usually 66). A baseball card consumer, on the other hand, knows (for example) if he has not yet found Dave Winfield, Keith Hernandez, Robin Yount or Ron Guidry, and can plan the number of his purchases accordingly. Baseball cards are the only product on a typical candy rack to set forth baseball statistics. They are, in other words, an education in baseball. Baseball cards have lasting play value rather than ephemeral play value. They can be saved for weeks, months or years. Very few products on a candy rack have the same sort of lasting play value.

67. Children have a fairly keen sense of the nature of the products they purchase (TR 2101). Furthermore, they "rotate" their purchases, that is, they buy a large variety of items. (DT5381, IIA; Table 14). Such rotation satisfies different needs with different purchases. (TR 4061).

68. Children make as many as half of their gum, candy and confection purchases on impulse, that is, their decision as to what to purchase is often made after entering the store. (DT5381; Table 5).

69. Topps's baseball cards are the only product on a typical candy rack to picture virtually all active major league players.

70. The principal function, or end use, of baseball cards is to satisfy a child's desires to learn about major league players, collect their pictures and trade their pictures. (P–161, Tables 25, 26).

71. "Play" is a function performed by baseball cards. However, the consumer studies in evidence did not show that children emphasized wanting to have fun or wanting to play as their reason for purchasing baseball cards. It is not likely, therefore, that all other low cost products with "play value" are perceived by children as being good substitutes for baseball cards.

72. Baseball cards also function as "treats". They gratify a child's urge to buy something pleasant at a convenience or grocery store.

73. Baseball cards require unique production facilities in two respects. First they are cut and wrapped on a "DF" machine, which is necessary for efficient production of trading cards. Second, and more important, a producer cannot sell baseball cards unless it first obtains permission from major league baseball players to do so. See *Haelen Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953).

74. There is insufficient evidence on the record to determine whether Topps's competitors consider baseball cards to be a separate market or submarket. Fleer has therefore failed to prove that the industry recognizes baseball cards as a separate market.

75. Baseball cards do not have distinctive prices. They are priced at about the same level as candy bars and many different types of chewing and bubble gum.

76. Sales of Bubble Yum, a soft bubble gum introduced nationally by Lifesavers, Inc. in 1976, had a huge adverse impact on the sales of traditional hard bubble gums, such as Topps's "Bazooka" and Fleer's "Dubble Bubble."

77. Close substitutes should show reciprocal sales movement.

78. Sales of baseball cards are not affected by sales of editorial (non–sports) cards. Editorial cards are not meaningful substitutes for baseball cards.

79. Topps often sells its editorial cards at a lower price than its sports cards.

80. Topps introduced into evidence an elaborate market study conducted by Child Research Service, Inc., a child marketing research firm headed by June Esserman. Mrs. Esserman testified as an expert at trial. The study consisted of an analysis of the results of interviews with boys ages 7–12 conducted during successive weeks outside of candy and convenience stores in three separate cities (Rochester, Cincinnati and Minneapolis). The children were asked

a great variety of questions about what they had considered purchasing, what they actually purchased, what they paid, etc.

81. During the first week of the Esserman study, the price of Topps's baseball cards was 20 cents. During the second week, the price of baseball cards was raised to 40 cents. Baseball cards suffered a precipitous drop in sales during the second week. A large percentage of those boys who considered baseball cards but did not buy them "bought something else instead"— largely because the price was too high.

82. The Esserman study was designed to show (and did show to an extent) the existence of price cross–elasticity among the items on a typical candy rack.

83. Sales of baseball cards were shown to be sensitive to a price increase of 100%. The Esserman study showed that a rise in price from 20 cents to 40 cents caused an 88% decline in sales of baseball cards. (DT 5381, Tables 1 & 4).

84. There is little evidence in the record to show whether sales of baseball cards are sensitive to small changes in price. In 1974, the price per card in the standard package rose about 4% (adjusted for approximately 6% inflation) over the 1973 price, and sales rose about 35% (adjusted for inflation). In 1975, the price per card in the standard package rose about 17% (adjusted for inflation) over the 1974 price, and sales fell about 17% (adjusted for inflation). In 1978, the price per card in the standard package fell about 12% (adjusted for inflation) compared to the 1977 price, and sales rose about 32% (adjusted for inflation). (P–182 through P–187; DT 5431R; stipulation of counsel).

85. Baseball cards are unique. For decades, they have been an important and distinctive part of many childhoods. Baseball cards have achieved a type of public recognition that distinguishes them from such items as other trading cards, bubble gum and candy. Cardboard, wallet–size pictures of active major league players have existed for generations. Even if the product was merely a casual idea of a long–forgotten promoter in the 1880's, and even if there are hundreds of variations and substitutes which logically might exist, the concept is now so embedded that baseball cards literally define themselves. The permanence of those cardboard pictures is a market reality which the Court must recognize.

86. The baseball cards themselves are the part of Topps's package that are primarily sought by children. The gum is of lower quality than Topps's normal bubble gum, and is offered simply as a premium for the cards. In fact, many children do not chew it. A number of low cost (perhaps baseball related) non–confectionary products would also serve as potentially attractive premiums, among them felt insignia, plastic novelties or emblems, magnets in the form of team logos, a batting average calculator (cf. DT 267), or iron–on patches.

87. The relevant economic submarket in which baseball cards are sold consists of all pocket–size pictures of active major league players, sold alone or in combination with a low cost premium, in packages priced from 15 cents to 50 cents.

### Competitive Impact of the Challenged Restrictions

88. Topps has faced no serious competition in the baseball card market since the 1950's. Since 1978, the interlocking contracts at issue in this case, as they have been applied (P–1, P–8, P–56), have made entry into the baseball card market very difficult or impossible.

89. Topps's rights are not protected by any patents or copyrights, nor were they at any time protected by patents or copyrights. There is no legal requirement that either Topps or an individual enter into an exclusive, as opposed to a nonexclusive, contract for the use of the player's picture. Topps did not have its market position "thrust upon" it.

90. Topps does not vary the format of its baseball card product. It markets only that type of card described in Finding 48, *supra.*

91. Fleer and Topps have essentially agreed that a competitor who could com-

pete evenly with Topps for major and minor league player contracts (assuming the Association would not block the major league segment of such an effort), could market a series of about 150 baseball cards within six or seven years. Those estimates were based on relatively complicated assumptions about the average careers of minor league players. (Topps Proposed Findings 155–157; Fleer Proposed Finding 203). Topps, on the other hand, could compete against that series in the sixth year with about a 570 card product.

92. The assumption that a competitor could compete evenly with Topps for player contracts is an optimistic one. Topps is an entrenched competitor, and its influence with the players is considerable. A competitor facing six (and likely more) years of uncertainty before it can market even an inferior trading card product is likely to take its capital and its energies elsewhere. (TR 733–734, 2589).

93. Each of the parties agrees that exclusive contracts are necessary in the baseball card business. The Court does not find that assertion credible, if what is meant is that the baseball card market will support only one brand of baseball cards. Topps has an obvious motive to make such an argument, and Fleer needed to make the argument to support its proposed injunctive relief. The Association, moreover, is in the business of granting exclusive licenses.

94. Exclusivity might be necessary in "fad" licensing, where competition might engender sufficient confusion in consumers' minds about the make–up of a product to ruin a one or two–year marketing effort. Baseball card consumers, on the other hand, have a demonstrably high degree of product awareness, and the permanence of baseball cards as a marketable item insures that competing products would have time to "sort out" in consumers' minds. Nothing in logic or proof at trial has suggested to the Court that the presence of two or more baseball card products on the same candy rack would somehow be harmful to competition.

95. It is doubtful whether it would be useful to a hopeful baseball card competitor to try to obtain agreements from players not to renew their commercial authorizations. Even assuming that the competitor reached such agreements with a group of players, it would still be required to surmount a clause in Topps's contract. At no time during the term of the contract can a player grant to anyone besides Topps the rights granted to Topps under the contract, even if those rights are to take effect at the expiration of the contract. Moreover, a player cannot, during the term of the contract, grant to another "*any rights similar [to]*" Topps's rights, even to take effect at the expiration of the contract. The right to market baseball cards with any low cost premiums, either confectionary or nonconfectionary, is a right "similar to" Topps's rights.

96. Sometime in the fall of 1968, Marvin Miller inquired as to Topps's position on a proposed Association license for the sale of baseball cards with rings. Topps, through Joel Shorin, vigorously opposed the granting of such a license, and said that Topps's attorneys had commented that the proposal would "disrupt [Topps's] program." Shorin advised Miller to advise the prospective licensee of Topps's position. (P–64)

97. To insure that Topps's rights were not violated, the Association included in its proposed contract with the licensee a provision that the intrinsic value of the rings had to be at least equal to half of the value of the whole product. The contract expressly referred to Topps's rights under its contracts with the players.

98. Milton Kayle (of Weston Manufacturing Corporation, the Association's one–time licensing agent) assured Topps that the Association would never knowingly do anything to violate Topps's rights under its contracts. Marvin Miller likewise told Topps that he was extremely careful not to violate Topps's rights. (P–69).

99. Topps and the Players Association routinely consult about whether a proposed Association license infringes Topps's exclusive rights. (TR 2369). The Association is

anxious to avoid conflict with Topps. (Miller Dep. 430).

100. In its discussions with agents of the Association, Topps often cites marbles as an example of a "sham" product, that is, a product which, if sold with baseball cards, would effectively infringe Topps's rights to sell baseball cards "alone". In 1965, the Federal Trade Commission specifically mentioned marbles as a product with which baseball cards *could* be sold in competition with Topps. *In re Topps Chewing Gum, Inc.*, 67 F.T.C. 744, 839 (1965).

101. In 1974, Topps objected to the sale of baseball cards by the Kellogg Company. Based upon a license from the Players Association, Kellogg sold packages of 54 baseball cards for $1.50, plus a box–top from a 60 cent (approximate) package of cereal. (P–85; P–338, p. 9). The Players Association did not yield to Topps's pressure, but instead obtained formal waivers from Topps to continue to license the product. (P–87, P–89, P–137, P–138).

102. Topps has never stated its opinion as to what the minimum value of a non-confectionary premium must be to avoid infringing Topps's rights to sell baseball cards "alone". Fleer's evidence supports the inference, and a finding, that Topps's policy of objecting to baseball card products sold either with confectionary products or with low cost non–confectionary premiums continues at present. Topps has presented no evidence that suggests the contrary.

103. The royalty income from sales of Topps's baseball cards is paid directly into the Association's group licensing program. In 1978, the licensing program generated about $1.1 million; Topps's royalty payments accounted for about $847,000 of that total, or more than 75% (P–119; TR 2331).

104. The Association has never licensed a baseball card product that promised to provide meaningful competition to Topps's product.

105. Before the signing of the agreement between Topps and the Players Association (P–1), the Association aggressively challenged Topps's market position, explored with competitors the possibilities of licensing a product to compete with Topps, and even contemplated using its influence with the players to gain all of the rights held by Topps. The signing of P–1 enabled the Association's group licensing program to share in the revenues of Topps's gum and baseball card product.

106. However, P–1 has also been a disincentive for the Association to explore the limits of Topps's rights, especially in the Association's licensing of non–confectionary baseball card products. The evidence shows that, had P–1 not been signed, the Players Association would have continued to test Topps's rights. As it is, the Association's incentive to challenge Topps has been greatly reduced by the substantial income generated by P–1.

107. In 1970, the Association licensed an organization known as Sports Promotions to sell packages containing four baseball cards and two iron–on patches. Topps objected to the product as an infringement of its rights. Notwithstanding that the licensed product included a non–confectionary product that very arguably did not infringe Topps's rights to sell baseball cards "alone", the Association did not seek to test the extent of Topps's rights. Rather, the Association licensed the product only for 1970, and with the understanding that it would not be sold in the same channels of distribution as Topps's product.

108. The Association has licensed products that arguably infringed Topps's rights–as, for example, when it licensed Beatrice Foods and ITT Continental Baking Co. to sell baseball cards as a premium to candy and cakes respectively. It has never, however, granted a license for a product whose principal attraction was the baseball cards themselves, with the possible exception of one stamp album. That product, however, included an album that was at least equal in value to the stamps.

109. P–1 is not, on its face, anti–competitive. However, because the Association holds and protects all of the rights to market groups of pictures of major league players not held by Topps, the *effect* of P–1 is

seriously and unreasonably to restrain competition. Because Topps has agreed to pay the Association royalties on its baseball card sales, no competition to Topps has arisen.

110. Topps and the Players Association possess, and have exercised, the power to exclude Topps's competitors from the baseball card market.

111. Fleer has made a reasonably persuasive showing that Topps's profits on baseball cards are, at the very least, consistent with the existence of monopoly power, although not, in the Court's view, dispositive of the question. Topps's profits on baseball cards are equal to or higher than its profits on high–risk, "fad" trading cards. (Topps's objections to the plaintiff's methodology in calculating relative profits have been considered, and are explicitly rejected as nit–picking). Baseball cards involve virtually no risk of failure each year. Competitors ought to be attracted to the marketing of a low risk product that is as profitable as other high risk products. (Fleer's analogy to bonds is quite apt–under normal market circumstances, the return to investors should decline, rather than rise, as risk decreases.) That no competitors have appeared and profits have stayed high suggests that Topps has the power to control prices and exclude competition. (P–338, pp. 60–64).

112. Topps's exclusive contracts with the players do not promote competition. In fact, they contain a number of seriously restrictive clauses. For example, during the term of the contract a player cannot assign to another the rights held by Topps, even to take effect *after* the contract expires. Moreover, a player is under contract to Topps for his first five major league seasons *whenever they occur*. If a player spends seven years in the minor leagues after signing his first Topps contract, he is committed to Topps, and Topps alone, for twelve years.

113. Topps's contracts certainly improve Topps's competitive position, and any businessman would consider them desirable rights. Nevertheless, they impede rather than promote competition.

114. Both Topps and the Players Association have acted to exclude competitors who sought to market baseball cards with low cost premiums.

115. The Association's conduct in (1) refusing to license baseball cards to be sold with low cost premiums, and (2) challenging direct solicitation of the players for marketing rights, inhibits rather than promotes competition in baseball cards.

116. Topps and the Players Association have combined to restrain trade unreasonably in the baseball card submarket.

*Damages*

117. Fleer has shown that it was excluded from any meaningful opportunity to compete for player contracts. It has not shown that it suffered any *arguably* quantifiable pecuniary loss as a result of its exclusion.

118. Fleer has struggled to make a profit in a number of the years during the 1970's. Its net income (loss) in eight of those years was as follows:

| 1977 | — | $346,621 |
| 1976 | — | · 502,257 |
| 1975 | — | 720,274 |
| 1974 | — | (309,261) |
| 1973 | — | 382,354 |
| 1972 | — | 268,926 |
| 1971 | — | 148,494 |
| 1970 | — | (200,016) |

Fleer had a net *operating* loss in 1978.

119. Judging from the guarantee that the players receive from Topps–approximately $165,000 in the aggregate–and judging from Marvin Miller's reservations about Fleer's $25,000 guarantee for the 5″ × 7″ product, it is apparent that an Association license for baseball cards, if granted, would be somewhat expensive. The typical royalty for an editorial trading card is about $10,000. A baseball card license could be much higher than that.

120. Fleer has never had a great deal of success in marketing trading cards. It has never had a trading card item which achieved $750,000 in sales. Topps and Donruss (in that order) are the leaders in trad-

ing card sales. Each aggressively bids for licenses and has had significant successes with such products.

121. Much of Topps's merchandising success (as to all of its products) has been a result of its use of a direct sales force, which calls on retailers directly. Fleer markets its products through gum and candy brokers, who sell the products of many different companies to wholesalers, retail chains and convenience stores. Fleer's brokers are paid on a commission basis. None has an incentive to "push" Fleer's products in particular. Topps's sales force, on the other hand, sells only Topps's products. A direct sales force is a much more effective marketing mechanism.

*Collateral Estoppel*

122. On January, 1962, the Federal Trade Commission filed a complaint against Topps under § 5 of the Federal Trade Commission Act (15 U.S.C. § 45). The F.T.C. alleged that Topps had "completely foreclosed competitors from the ... baseball picture card market by entering exclusive picture card contracts with almost all major [and minor] league baseball players....", and had "created and effected a monopoly in the manufacture and distribution of baseball picture cards...." 67 F.T.C. 744, 745–6 (1965).

123. The F.T.C.'s Hearing Examiner found that Topps had monopolized baseball cards as separate articles of commerce in violation of § 2 of the Sherman Act and § 5 of the Federal Trade Commission Act. 67 F.T.C. at 833–4. The Hearing Examiner's Findings of Fact indicated that Topps had aggressively and persistently acquired and protected its exclusive rights to market baseball cards alone or with bubble gum in much the same way that it does at present. 67 F.T.C. at 826–33.

124. The full Commission reversed the Hearing Examiner's finding of liability. It found that the relevant market was not baseball cards sold alone, but rather "baseball picture cards sold to the consumer in combination with other products." 67 F.T.C. at 839. The Commission held that

Topps did not monopolize the market as the Commission defined it, because baseball cards could be sold in combination with a variety of low cost items without violating Topps's exclusive rights. 67 F.T.C. at 839–40.

125. The Commission's finding on relevant market is remarkably similar to the market found by this Court to exist at present. Compare Findings 87 and 124, *supra*. The Commission's findings are, however, outdated in some respects. The Commission found that "Plainly, the real commercial significance of such cards is as a promotional device" to bubble gum. 67 F.T.C. at 838. At that time, Topps's standard package consisted of five cards and a slab of gum. Now, Topps's standard package consists of 14 cards and a smaller piece of gum, and it is clear that the *cards*, and not the gum, are the principal attraction. Moreover, there was no evidence before the Commission that indicated that Topps would challenge low cost non–confectionary competition as an infringement of Topps's rights to sell baseball cards "alone". Hence, the Commission found that the market as it defined it was very easy to enter. Finally, the Commission did not have to consider the impact of the Association's contracts on market entry, because the Association's licensing program did not yet exist.

126. The Commission also held that Topps's contracting efforts in the minor and major leagues were not an unfair method of competition under the Federal Trade Commission Act, because "it should not take Fleer or some other firm long to shake [Topps's] hold by competing vigorously for new minor league players as well as for major leaguers as their contracts with [Topps's] expire." 67 F.T.C. at 842.

127. The F.T.C. did *not* consider whether it would have been reasonable to have expected competitors to have made a direct assault on Topps's contracts if such competitors could *not* have sold baseball cards with a low cost non–confectionary product. The F.T.C. assumed that the latter avenue of competition was entirely open.

128. Conditions in the baseball card market have changed significantly since the F.T.C. made its findings in 1965. Market conditions and the conduct of the competitors were different then than they are now.

### Cost of Premiums

129. One factual finding requires special elaboration because a significant part of the Court's legal analysis depends upon it. That finding is that, to compete with Topps, a competitor would be required to market a baseball card product approximately equal to Topps's product on a price per card basis. That finding is an inference based on the trial evidence. The salient evidence from which that inference is drawn is as follows:

1. Eighty to ninety percent of those children who purchase baseball cards are aware of the price. (DT 5381, Tables 4, 18, 19; pts. II C, D.)

2. Roughly two thirds of baseball cards purchased are purchased by "heavy" buyers–i. e. those who purchase more than 200 cards per year. (P–161)[2] Such buyers are more likely to be aware of the precise contents of the package, including price and number of cards, than those who buy fewer packages.

3. About 93% of baseball card consumers buy some cards themselves; 69% buy most or nearly all themselves; 85% buy half or more themselves. (P–161) The consumer, who is the person likely to be aware of the contents, and the purchaser are, in large measure, the same person.

4. Only about 3% of baseball card buyers begin collecting to obtain the gum. (P–161, Table 38) The cards themselves are what the children want most.

5. The most often mentioned reason for ceasing to buy baseball cards is cost. (P–161, Table 21).

6. The most often mentioned reasons for collecting baseball cards are to "get favorite players" and to "learn about players" (P–161, Table 26). For a child to

obtain his favorite players in a full series of cards he must buy a relatively large number of cards, unless he is lucky in his early purchases. In collecting a large number of cards, it is likely that he will seek the greatest number of cards for the least money.

7. Topps is an experienced, entrenched producer with significant competitive advantages over new entrants, by virtue of its market position.

130. The evidence shows that most baseball card buyers are aware of the attributes of Topps's product and its price. Moreover, the general intent in buying the package is to get the cards, in collectable numbers. A competitor could not reasonably compete with Topps's product with a premium higher in cost than Topps's gum, because the cost of the premium would necessarily raise the price of the package. The product would not, therefore, meet the child's wants as economically as Topps's product is able to. An exceptionally attractive premium might overcome part of a cost disadvantage, but the chances of finding an exceptionally attractive non–confectionary premium are reduced by the hit–or–miss, "fad" nature of novelties marketing. Certainly, competitors might be able to divert some business from Topps by selling baseball card packages containing higher cost premiums, but to be truly competitive over the long run, only a competitively priced baseball card package (i. e. competitive on a price per card basis) would survive in the marketplace.

Thus, Topps's policy of objecting to "sham" products does more than simply protect its rights. Because of the way that that policy has been applied by Topps and the Association, *effective* competition to Topps has not been possible.

### CONCLUSIONS OF LAW

The Court has subject matter jurisdiction in this matter under 28 U.S.C. § 1337, and has personal jurisdiction over the parties.

---

2. The "⅔" figure was based on responses from 802 children contacted about the study that is summarized in P–161, not the 600 children who ultimately figured in this study. The "⅔" fig-

ure is apparently based on an estimate of 200 cards per heavy buyer; 125 per medium buyer; and 25 cards per light buyer. (P–161, p. 2; also DT 5381, p. 13).

*Statute of Limitations–Standing*

Topps has raised two technical defenses to Fleer's § 1 and § 2 damage claims which require brief discussion. Topps contends first, that Fleer's claim is barred by the statute of limitations; second, that Fleer does not have standing under § 4 of the Clayton Act, 15 U.S.C. § 15, to bring a suit for damages, because it has not suffered injury to its business or property because of any conduct of Topps.

■ The statute of limitations for this action is 4 years. 15 U.S.C. § 15b. Thus, Fleer must show that Topps and the Players Association have engaged in the conduct of which Fleer complains within the statutory period. If, within the statutory period, the defendants *have* engaged in the conduct that is alleged, the Court can proceed to determine whether that conduct violates the antitrust laws. *Poster Exchange Inc. v. National Screen Service Corp.*, 517 F.2d 117, 124–8 (5th Cir. 1975). Fleer has shown that Topps, within the statutory period, entered into renewals of the allegedly restrictive contracts with the players; renewed its royalty agreement with the Players Association; and refused to waive its exclusive rights at Fleer's request. The Players Association likewise renewed Commercial Authorizations with its members, and extended the royalty agreement with Topps within the statutory period.

Topps argues that Fleer is also required to show injury within the statutory period, and the argument is perhaps valid. See *Saunders v. National Basketball Association*, 348 F.Supp. 649, 652 (N.D.Ill.1972). That is, Fleer arguably must show that it suffered injury to its business or property–i. e., had standing–within the limitations period, or be barred by the statute of limitations. Because Fleer has shown that its standing to bring suit existed, if at all, during the limitations period, we may properly turn directly to the question of Fleer's standing.

**3.** See also Triangle Conduit and *Cable Company v. National Electric Products Corp.*, 152 F.2d 398 (3d Cir. 1945).

Section 4 of the Clayton Act sets forth a basic prerequisite to suit which each antitrust plaintiff must meet: "Any person *who shall be injured in his business or property by reason of anything forbidden in the antitrust laws* may sue therefor in any district court of the United States...", 15 U.S.C. § 15 (emphasis supplied). Topps argues that Fleer has not proved that it has been damaged by any unlawful conduct of Topps.

■ Fleer responds, correctly, that injury to business or property may be proved indirectly as well as directly. The Fifth Circuit has recently summarized how indirect proof of injury may be made:

"Of course, one need not have an actual going business to establish a private antitrust injury under 15 U.S.C. § 15. Recovery can be had for a wrongfully frustrated attempt to enter a business. ... There are 'two significant requirements' for establishing such an entitlement to recovery: (1) an intention to enter the business and (2) a showing of preparedness to enter the business. *Martin v. Phillips Petroleum Company*, 365 F.2d 629 (5th Cir. 1966) ....

In *Martin v. Phillips Petroleum Company*, 365 F.2d at 633–34, this Court listed four elements of preparedness: (1) 'the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment'; (2) 'the consummation of contracts by the plaintiff'; (3) 'affirmative action by plaintiff to enter the business'; (4) 'the background and experience of plaintiff in the prospective business'. ..."

*Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979) [3]

Fleer has shown that it met three of the four elements of preparedness. It had the ability to finance and the necessary equipment for baseball cards; it took affirmative action to enter the business by putting forth its 5″ × 7″ proposal; and it had background and experience in the prospective

business. It did not consummate contracts in its attempt to enter, but, of course, its chief complaint here is that the defendants have erected unreasonable obstacles to its doing so.

As noted earlier, Topps did not have the right to prevent the Players' Association from licensing sales of player likenesses of 5″ × 7″ or larger. As to such products, Topps retained only a right of first refusal, i. e., Topps could prevent licensure of a 5″ × 7″ product to another company by agreeing with the players to market a 5″ × 7″ product itself.

Topps argues that because it did not exercise its right to object to Fleer's 5″ × 7″ proposal, its conduct did not frustrate Fleer's only apparent attempt to enter the market. Therefore, Fleer arguably did not suffer injury at the hands of Topps.

■ Topps's argument is superficially plausible, but it misconstrues the import of Fleer's attempt to enter the player likeness marketplace, and misconstrues the "affirmative action ... to enter" requirement. Fleer's 5″ × 7″ proposal was designed to *avoid* conflict with Topps's exclusive rights. The proposal reflected both preparedness and an intention to enter the baseball card market, *and* a judgment that a frontal assault on Topps's contracts would be impractical. Topps can hardly argue that it did not frustrate Fleer's attempt to enter the business, or that Fleer suffered no injury from Topps's conduct, simply because Fleer chose to attempt entry by way of a route likely to avoid the obstacles constructed by Topps.

■■ Denial of all opportunity to compete is an "injury" under § 4. That is the injury that Fleer has alleged and proved. The "preparedness and intention" doctrine of standing was designed to permit excluded competitors to challenge their exclusion without being first required needlessly to incur economic harm.

■ Certainly had Fleer not made its 5″ × 7″ proposal, its standing would be in doubt. "Affirmative action by plaintiff to enter the business" is, in the Court's view, a necessary prerequisite to suit, in a way that perhaps the other three indicia of preparedness, listed *supra.*, are not. Otherwise, a company could bring suit without any showing that it was a bona fide competitor "waiting in the wings." However, there is no requirement that the affirmative attempt to enter be frustrated directly by the alleged antitrust violation, so long as the gravamen of the complaint is that the alleged antitrust violation has prevented direct attempts at entry, and so long as the *injury* that is alleged is the proximate result of exclusionary practices.

■ Fleer's affirmative attempt at entry fully reflected preparedness and intention to enter the market and .Fleer has standing to bring this suit. Cf. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

### Relevant Market

Fleer alleges that Topps has monopolized and unlawfully restrained trade in a relevant economic market, defined by Fleer as baseball cards sold alone or in combination with chewing gum, candy or confections. Topps denies that it has sufficient market power to monopolize or restrain competition in the market as defined by Fleer; and argues that, in any event, the relevant economic market includes all gum, candy, novelties and low cost children's treats sold in retail outlets catering to children.

■ The Court has concluded that Topps and the Players Association have unlawfully restrained and monopolized trade in a relevant economic submarket, namely pocket-size pictures of active major league baseball players, sold alone or in combination with a low cost premium, at a price of 15 to 50 cents.

■ To prove its § 1 claim Fleer must show, generally speaking, that the defendants unreasonably restrained trade. See *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Continental T. V., Inc. v. GTE–Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). To prove its § 2 claim,

Fleer must show that the defendants possessed and exercised the power to control prices or exclude competition. *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

An antitrust plaintiff cannot, however, prove a defendant's ability to restrain or monopolize trade without also proving that the defendant is able to do so in a relevant economic market. Otherwise, its economic power does not threaten harm to consumers or to competition. A finding as to the definition of the relevant economic market is therefore required both under § 1, *American Motor Inns, Inc., v. Holiday Inns, Inc.,* 521 F.2d 1230, 1247 (3d Cir. 1975), and under § 2. *duPont, supra.*

Determination of the relevant market is central to this case, as it is in many antitrust cases, because market definition is crucial to determining the reasonableness or unreasonableness of a firm's market power in light of the policies underlying the antitrust laws. If the relevant economic market in which baseball cards are sold is, as Topps argues, all gum, candy, novelties and low cost children's treats sold in retail outlets catering to children, Topps and the Players Association have neither the power nor the ability to monopolize or unreasonably restrain trade in the market. If, on the other hand, the relevant market is, as Fleer contends, baseball cards sold *alone or* in combination with bubble gum, the ability of Topps and the Players Association to exclude competitors is magnified considerably.

The Court takes considerable guidance from the analysis in *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962):

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross–elasticity of demand between the product itself and substitutes for it. However, within this broad market, well–defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. duPont deNemours and Co.,* 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

It appears that Topps may have defined the "outer boundaries of a product market", i.e. the "treat" market. There is some interchangeability of "use" among all of the items on a typical candy rack. It is apparent to the Court, however, that Topps's proposed market is not meaningful for any antitrust purpose.

The Court's findings of fact on the submarket question are set forth earlier. To summarize, the Court found that the public recognizes baseball cards as a separate market. Baseball cards have very peculiar characteristics and uses. Baseball cards require distinct production facilities, especially the contracts needed to market the product. Baseball cards are purchased by distinct customers. Finally, baseball cards are sold through specialized channels of distribution.

Baseball cards do not meet a few of the *Brown Shoe* criteria. They have not been shown to be recognized in the industry as a separate market; they do not have distinct prices; sales of baseball cards are sensitive to large price changes, but it is not clear whether they are sensitive to small changes.

On balance, we hold that baseball cards are a distinct submarket of whatever larger gum, candy and novelty market may be said to exist, and we do so for a number of reasons other than, and in addition to, the *Brown Shoe* criteria.

First, baseball cards differ from other "treats" in that their sales are highly seasonal. Consumers' interest in baseball cards exists almost exclusively during the spring. They have a "get'em while they're hot" appeal which enhances their attraction vis–a–vis the year–round items on a candy

rack. Second, baseball cards, unlike most successful novelty items, are truly perennial and not merely "fads". Children expect them to re-appear each year. Third, as will be discussed at greater length *infra.*, Topps is not required to engage in any significant non–price competition to maintain its market position in baseball cards. It sells one basic type of baseball card. Such an absence of planned product differentiation indicates that baseball cards are sufficiently different in function from other gum, candy and novelties to sell well without further differentiation. No close substitutes (in qualitative terms) exist.[4]

Finally, the plaintiff's evidence on cross-elasticity of demand corroborates the Court's submarket definition. Fleer showed that a comparison of gross sales of likely substitutes should show reciprocal sales movement. That is, as sales of substitute A rise, the sales of substitute B should fall. Fleer demonstrated that its analytical technique is valid at least in the bubble gum market. As sales of soft bubble gum made huge gains in recent years, sales of traditional hard bubble gum declined dramatically. The function that bubble gum serves can be met by different, eminently substitutable products.

Sales of baseball cards, however, are unaffected either by sales of other trading cards (the most likely functional substitutes) or by sales of bubble gum.[5] That evidence corroborates a crucial fact in the case: there is no product on the market which meaningfully substitutes for baseball cards over the long run for purposes of their *principal* function, i. e. fulfilling a child's desire to learn about players and to collect and trade their pictures.

■ Defining a market is the process of determining what products substitute for each other for the "same purposes". *duPont, supra.*, 351 U.S. at 395, 76 S.Ct. at 1007. Virtually every product sold, however, can be said to have a number of uses, some more general than others. Ultimately, market definition must be concerned with the *principal* use of a product. Consumers most need the benefits of competition when they purchase a product to use it for its principal function. More general functions are much more likely to be able to be performed by a variety of only marginally competitive products.

A child may buy hundreds of candy bars or packages of gum each year, but those purchases do not affect his long–term plans to learn about players and to collect and trade their pictures. A candy bar may substitute for baseball cards once, or twice, or more often, depending upon a child's appetite or his desire for a treat; but a candy bar is not a substitute for baseball cards over time. Children, like adults, meet different needs with different purchases, and to say that a "treat" market is relevant for antitrust purposes, because the items on a candy rack substitute for one another in the "treat" function, is to say that "nutrition" is a relevant market for antitrust purposes because most of the items in a supermarket at one time or another serve as substitutes, depending on the meal plans of consumers.

4. Continuous product differentiation *can* be an earmark of a competitive market structure, assuming a non–expanding market. Automobiles, for example, which we can presume to be in a relevant economic market (comprising, perhaps a number of submarkets) are endlessly differentiated. Where consumers can substitute freely, producers seeking to increase their market share often differentiate their products, to try to gain a larger slice of a fixed pie. A monopolist, on the other hand, is, by definition, the sole or dominant producer in a market. Its incentive to differentiate is not nearly as strong as it would be in a competitive market.

5. Topps argues that Fleer's proof is of little value because it was based on sales data from Topps's trading card and gum products. Topps suggests that the data would certainly not show any significant level of substitution between baseball cards and other Topps cards, because Topps would not market a trading card which competed with–"cannabalized"–baseball cards. If Topps *concedes* that Charlie's Angels cards are not substitutes for baseball cards, it is difficult to see how it can argue that a Baby Ruth bar *is* a substitute for the cards. Topps either believes its "treat" definition of the relevant market or it does not, but we fail to see how Topps can leave all of its own trading card products out of that proposed market, *except* for baseball cards.

Topps did prove that there is some substitution among the items on a candy rack, but it did not rebut the plaintiff's showing that a submarket exists. As *Brown Shoe, supra.*, makes clear, proof of some price cross–elasticity and some substitution among products does not necessarily demonstrate the existence of a relevant market for antitrust purposes, nor does it mean that consumers are not suffering from an absence of competition in a relevant submarket.

A submarket is certainly as difficult to define as a market, but the need for the submarket concept is apparent, especially in a § 1 case. Serious anti–competitive effects can escape unremedied if all products which exhibit some price cross–elasticity must be grouped in the same broad product market. Not all of the ill–effects of an unreasonable restraint of trade or of monopolization in a submarket are ameliorated by whatever price competition the product faces in a broader market. In the case of baseball cards, the ill–effects of an absence of competition in the submarket have been significant, as the discussion, *infra.*, will show.

### The Section 1 Claim

#### A.

The plaintiff has alleged that Topps and the Players Association have unreasonably restrained trade in a relevant economic market in violation of § 1 of the Sherman Act. There is no question that Topps's contracts with the players restrict competition in a significant part of the market. Under those contracts, Topps's right to sell cards alone or with gum, candy or confection is exclusive, which means, of course, that competitors cannot market a product identical to Topps's product. Competitors who seek to enter the baseball card market thus have only two options: they can compete directly with Topps for contracts with the players, or they can seek a license from the Players Association to market baseball cards with a product other than gum, candy or confection, that is, a "non–confectionary" product.

The ability of a competitor to compete directly with Topps for contracts with individual players is discussed *infra*. We turn first to the issue of non–confectionary competition.

Fleer has argued that non–confectionary competition is impossible because Topps and the Association have barred entry by non–confectionary competitors. Topps has allegedly accomplished that objective by raising the possibility of contract infringement suits against any company which might hope to market baseball cards with a *low cost* non–confectionary product.

The Court and the parties have come to call that threat of suit the "sham product" issue. Topps's contracts with the players give Topps exclusive rights to sell the players' pictures "alone or in combination with chewing gum, candy or confection." The contracts do not in any way mention or explicitly restrict sales of baseball cards "in combination with" non–confectionary products. Nevertheless, were a competitor to sell baseball cards with a non–confectionary product so small in value as to be virtually worthless, that competitor would, in effect, be infringing Topps's exclusive contractual rights to sell baseball cards "alone".

Topps's principal defense to this suit has been that there are a "host" of non–confectionary items with which baseball cards can lawfully be sold. (Topps does *not* say what the minimum value of a non–confectionary product must be, in its view, to avoid infringement of Topps's rights.) Topps's defense rests on a single premise: that baseball cards sold with non–confectionary products would provide meaningful competition to Topps's standard product. The Court has found, as a factual matter, that Topps is correct. However, only a certain type of non–confectionary combination would be successful. To be competitive with Topps a competitor must be able to match or approach Topps's price per card. For a competitor to do so, the non–confectionary product to be included with the baseball cards would have to be similar to Topps's gum in production cost. Otherwise, Topps's market dominance and comprehensive player rights, in conjunction with a lower price per card, would pose a nearly

insuperable obstacle to meaningful competition.

■ Because Topps's exclusion of confectionary competition is reasonably clear, Fleer's § 1 claim turns on the question of whether the defendants have combined to restrain trade unreasonably by prohibiting or discouraging sales of baseball cards in combination with low cost non–confectionary premiums. Fleer has proved that they have.

### B.

Topps holds exclusive rights to the sale of baseball cards alone or in combination with gum, candy or confection. The Players Association is, at the moment, Topps's chief competitor, because it holds all of the rights needed to market a competing set of baseball cards sold in combination with non–confectionary products for non–confectionary rights (as Topps has done with confectionary rights), because the Players Association has, under the terms of its commercial authorizations, opposed and would oppose any such effort.[6] Hence, if a competitor seeks to compete with Topps by marketing a non–confectionary baseball card product, it can only do so by obtaining a group license from the Players Association. The Association refuses to grant licenses for the sale of baseball cards with low cost non‑confectionary products, because, in its self‑interest, it wishes to avoid conflict with Topps's rights. It also wishes to avoid lessening its royalty income from Topps's products.

The effect of this odd combination of interlocking rights and conduct has been to exclude completely any meaningful competition to Topps.

■ The plaintiff must prove, by a preponderance of the evidence, that the defendants have engaged in some "concerted" unlawful action. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977). Topps's defense has been that it merely exercised its lawfully held contractual rights, without trying to expand them unlawfully, and that the Players Association was solely responsible for foreclosing non–confectionary competition with Topps.[7]

Topps's position is a little like that of the boy who killed both his parents, later to throw himself on the mercy of the court because he was an orphan. Topps's exclusive contracts foreclose all but a small slice of the market, and Topps has pursued a policy of objecting to "sham" non–confectionary products; yet, it seeks to attach sole responsibility for market foreclosure on the Association. Whatever the words "contract combination or conspiracy" mean must apply to the combination shown in this case. Not to call these interlocking exclusive contracts a "combination" would be to close one's eyes to reality.

The joint unlawful conduct in this situation can be summarized in one sentence. Topps and the Players Association have acted jointly in excluding Topps's competitors.

Each party has had an interest in excluding, and has acted to exclude, producers of baseball cards to be sold with low cost premiums. Topps has had that interest for an obvious reason–it did not want direct competition. Topps received an implicit warning from the F.T.C. in 1965 to the effect that Topps could have been found to have been a monopolist if it were not for the ease

---

**6.** The Players Association has represented that it would not oppose individual contracting efforts directed toward acquiring the rights now held by Topps, i. e. the rights to sell baseball cards alone or with gum, candy or confection. The Association would oppose any other attempt to acquire group rights through individual contracting.

**7.** Much of the discussion that follows in the text centers on the defendants' concerted conduct with respect to non–confectionary competition. The Association did not assist Topps in

signing baseball card contracts with minor league players, and therefore arguably did not act in concert with Topps as to foreclosure of much of the market. We do not believe that competitors may escape § 1 liability by arguing that their *joint* conduct (if any) foreclosed only a small part of the market and that *unilateral* conduct foreclosed the rest. In any event, the Association did at times act in concert with Topps to protect Topps's rights under Topps's player contracts. See, e. g., Finding 22, *supra*.

with which competitors could enter the market with "sham" products. Nevertheless, Topps has pursued a policy of advising the Association and competitors that Topps would vigorously oppose the sale of baseball cards either with confectionary premiums *or* with low cost non–confectionary items. Topps has also refused and continues to refuse to define what a "sham" product is, engendering further uncertainty in competitors' minds.

The Players Association shared Topps's interest in excluding confectionary and low cost non–confectionary competition in part because it wanted to avoid legal conflict with Topps's rights. P–1, the Agreement between Topps and the Players Association relating to royalties paid to the Association from the sale of Topps's baseball cards, was the device that made the Players Association self–imposed restraint possible. Topps agreed to finance, as it were, the Players Association's cautious approach to the licensing of baseball card products that would have competed with Topps's product.[8]

An uncompromised competitor of Topps would have had an interest in testing the breadth of Topps's rights. If the Players Association had not shared in Topps's revenues from baseball cards, it too would have wanted to test Topps's rights to their fullest.[9] Because of the contract between Topps and the Players Association, the Players Association did not need to test Topps's rights, and the only avenue mean-

ingfully to compete with Topps was closed. But for P–1, some low cost non–confectionary or other competitive item would eventually have been licensed by the Association.

Topps argues (rightly we think) that the Association did not act at Topps's behest in rejecting, or requesting modification in, certain low cost non–confectionary licensing proposals. Rather, the Association acted in its own interests. That fact does not change the concerted nature of the defendants' conduct. As the Supreme Court held in *Albrecht v. The Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), a participant in an unlawful combination need not share the dominant partner's intent to achieve an unlawful result. See also *United States v. General Motors Corp.,* 384 U.S. 127, 142, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966). It is enough that the minor partner, because of an agreement with the major partner, is willing to act in a way that brings about an unlawful result.[10]

## C.

This is a "Rule of Reason" case. See *Chicago Board of Trade v. United States, supra; Continental T. V., Inc. v. GTE Sylvania, Inc., supra.*[11] In a Rule of Reason case, the Court is required to make findings as to the actual impact of the alleged anti competitive practices on competition within the relevant market, to determine whether the practices amount to an unreasonable restraint of trade. See *Na-*

---

**8.** The Players Association was cautious only in licensing "baseball card" products. With respect to any products that competed less directly with Topps's standard package, such as where the cards were sold as a premium, the Association was much more aggressive.

**9.** The Players Association *did* test Topps' rights in 1968, which was the impetus for the signing of the agreement between Topps and the Association in the first place.

**10.** Topps cannot rely on the fact that the contract between it and the Players Association was signed only because of pressure by the Association. Topps elected to join 'em rather than to try to beat 'em, a choice which is, of course, subject to § 1 scrutiny. In any event, Topps showed that it had the power to resist most of the Association's demands, and, as a

last resort, could have placed the antitrust consequences of the Association's influence with the players in issue. Topps was not *required* to sign P 1; rather, it chose to.

**11.** Although the plaintiff argues that the group boycott rubric applies to the facts of this case, and that therefore Topps is committing a per se violation of § 1, the facts do not support the plaintiff's contention. The group boycott label is best applied to concerted refusals to deal with a given competitor, entered into by a group of competitors. Cf. *Klor's Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The facts of this case simply do not show any per se violations of the antitrust laws.

*tional Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *American Motor Inns, Inc. v. Holiday Inns, Inc., supra.*, 521 F.2d at 1247, n. 46 (and cases cited). In this case, the anti–competitive effects of Topps's present uncontested market position are striking.

There is a serious, and in the language of the cases, "pernicious" effect on non–price competition which results from Topps's position in the baseball card submarket. The ways in which Topps is *not* challenged by competition are bounded only by one's imagination.

Topps does not face competition from player stickers, analogous to Fleer's team logo stickers, because Topps holds the right to use players' likenesses on such a product. Topps does not face competition from decals depicting major league players. No baseball cards or player likenesses are marketed nationwide in packages containing only those players on a given team. No baseball cards or player likenesses are marketed in packages containing only players in a given league, i. e. National or American. No baseball cards are marketed which include statistics on stolen bases or fielding percentage, game winning hits, successful sacrifice attempts, or any number of other statistics which a competitor might choose to offer to attract baseball card purchasers. All–star packages are not marketed. There is nothing in the record to indicate that consumers wish to purchase a large number of packages before finding cards of players in whom they are interested. Certainly, there are some collectors who want to collect cards in exactly the way that Topps sells them, but Topps, by its marketing strategy, insists that *all* baseball card purchasers collect their favorite players in a hit–or–miss manner.

Nor should the absence of price competition be ignored. The evidence shows that Topps has often sold its non–sports trading cards at a price slightly below its sports trading cards. Obviously, a competitor might choose to market a baseball card package lower in price than Topps's package.

Such effects of an absence of competition in the baseball card submarket are both unnecessary and unreasonable.

Topps and the Association have both argued that their contracts with players do not unreasonably restrain trade because the contracts are for fixed, rather than indefinite terms. It has been suggested that Fleer, or any other competitor, may compete in the baseball card market by approaching individual players and outbidding Topps or the Association for their respective contractual rights.

Under very optimistic assumptions, a well–financed competitor who could bid as successfully as Topps in player–by–player competition for contracts could market a bubble gum and baseball card product in six or seven years. Under similarly optimistic assumptions, a competitor who could persuade players not to renew their standard commercial authorizations, insofar as the commercial authorizations apply to baseball card rights, might be able to market a non–confectionary baseball card product in about three years. That would depend upon whether a court would construe Topps's contracts to permit players to sign non–confectionary agreements during the term of their Topps contracts. (See Finding 95, *supra.*)

The Court, as finder of fact, is asked to find that an otherwise unreasonable combination in restraint of trade is "reasonable" because it need only last seven, or perhaps three years. Different finders of fact would perhaps react differently to such an argument. This Court finds it wholly unpersuasive, at least on the present record.

Topps and the Association understandably value their exclusive rights highly. Those rights represent certainty and likely profitability for years into the future. The rights have not, however, promoted competition, which, in light of the serious restraints that they have created, is the only attribute that might have made them reasonable.

In the future, the Association's group licensing power is likely to be a major factor in guaranteeing competition to Topps, as the Court's discussion of remedy will suggest. We cannot, however, accept the notion that the defendants' restrictive behavior was really not unreasonably anti-competitive, because, all along, a well-financed competitor might have been able to overcome it in three to seven years.

■ It was apparent both to Topps and the Association that their contracts foreclosed most of the possible avenues by which competitors might have competed in the baseball card market. Their conduct in excluding competition from baseball cards sold with low cost premiums no matter how it might be characterized in the abstract, was, in those circumstances, unreasonable.

### Section 2

Although this case was litigated in part as a § 2 case, the facts as they have developed seem better suited to analysis under the § 1 "combination in restraint of trade" rubric. Nevertheless, § 2 has been asserted as a grounds for liability, and it is the Court's duty to reach the § 2 claim.

■ For virtually the same reasons that the defendants have been found to have violated § 1 of the Sherman Act, they are also liable under § 2. The defendants' respective contracts with the players and the defendants' dealings with each other have operated to foreclose the entry of competitors into a relevant market. Section 2 is therefore implicated.

■ Monopoly power is the power to control prices or to exclude competition in a relevant market. *United States v. E. I. duPont de Nemours, Inc., supra.*, 351 U.S. at 391–2, 76 S.Ct. at 1004–05. The plaintiff in this case has not proved that Topps has the power to control prices (although we cannot say that that power does not exist), but it has proved that the defendants possess and have exercised the power to exclude competition in baseball cards. Where monopoly power and its exercise can be shown, a violation of § 2 has been established. See, e. g. *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 346 (D.Mass.1953) (Wyzanski, J.), *aff'd* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

This case is somewhat unusual in that the alleged monopoly comprises two economic actors rather than one. It therefore falls outside many of the cases dealing with single firm monopolies. Section 2, however, proscribes multi-firm monopolies by its express terms:

"Every person who shall ... combine or conspire with any other person or persons to monopolize ... shall be [liable under this Section]".

■ It is often said that, to prove a combination or conspiracy to monopolize "there must be a specific, subjective intent to gain an illegal degree of market control." *American Football League v. National Football League*, 323 F.2d 124, 132, n.18 (4th Cir. 1963); *Lewis v. Pennington*, 400 F.2d 806 (6th Cir. 1968); *Woods Exploration & Production Co. v. Aluminum Company of America*, 438 F.2d 1286 (5th Cir. 1971). The parties have not sufficiently framed the question of specific intent to permit the Court to make a reasoned determination as to whether it existed, but, in any event, the Court holds that such a finding is not required in this case.

■ Close examination of the cases requiring proof of a specific intent where conspiracy to monopolize is alleged, reveals that such a finding is required only where monopoly power itself has not been proved.

"[A] specific intent to accomplish an unlawful result is necessary *where monopoly power has not been obtained* and the charge is an attempt or conspiracy to monopolize."

*Lewis v. Pennington, supra.*, 400 F.2d at 811 (emphasis supplied).

■ Where conjoint monopoly power has been shown to exist, and proof of the exercise of that power has likewise been made, the members of the combination may be held liable under § 2 *absent* proof of specific intent:

"It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the antitrust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements [citations omitted]. To require a greater showing would cripple the Act. As stated in *United States v. Aluminum Co. of America*, 2d Cir., 148 F.2d 416, 432, 'no monopolist monopolizes unconscious of what he is doing.' *Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by the Act.*

. . . . .

[In this case] [m]onopoly rights in the form of certain exclusive privileges were bargained for and obtained. These exclusive privileges, being acquired by the use of monopoly power [but without specific intent] were unlawfully acquired. The appellees, *having combined with each other and with the distributors to obtain those monopoly rights formed a conspiracy in violation of §§ 1 and 2* of the Act."

*United States v. Griffith*, 334 U.S. 100, 105, 109, 68 S.Ct. 941, 944, 946, 92 L.Ed. 1236 (1948) (emphasis supplied).

 The analysis suggested by the Court in *Griffith* is particularly applicable to this case. Topps and the Players Association have combined (i. e. have acted in a concerted manner) to exercise their power to exclude Topps's competitors from the baseball card market. In other words, they have combined to exercise monopoly power.

Where monopoly power exists by virtue of a § 1 "combination in restraint of trade" the proof of concerted action that is required to prove a violation of § 1 will support a finding of liability under § 2.

We hasten to point out that, while the principles enunciated in *Griffith* are directly applicable to this case, the facts are distinguishable in one respect. There, each member firm of the § 2 combination possessed some "monopolies" of its own in its one–theatre towns. In this case, it is arguable that neither Topps nor the Association has monopoly power by itself.

The distinction is not significant in a way that can alter the § 2 result in this case.[12] Together, Topps and the Players Association have all of the market power there is in the baseball card market; and they have unlawfully exercised that power in a way which has left the Topps product alone in the market. We hold, in this nearly *sui generis* situation,[13] that the defendants are liable for their possession and exercise of monopoly power, that is, the power to exclude competition. Further, we hold that no determination of specific intent is necessary on the facts of this case.

### Collateral Estoppel–Unclean Hands

Topps has raised the defense of collateral estoppel, arguing that the facts found by the Federal Trade Commission in 1965, in *In re Topps v. Chewing Gum, Inc.*, 67 F.T.C. 749 (1965), are binding upon this Court now. The defense was treated at length at the pretrial stages of this case (see 415 F.Supp. 176, 182 (E.D.Pa.)), but as the proof devel-

**12.** The distinction between *Griffith* and this case is not, in any event, much of a distinction. The importance of the single town "monopolies" in *Griffith*, was not that their existence permitted the invocation of the "monopoly" statute. Rather, the Court was concerned about the anti–competitive market power that was achieved when isolated, otherwise lawful market advantages were used in aggregation. Each defendant here, as in *Griffith*, possesses considerable market power of its own. In this case the market power is not, strictly speaking, a result of an aggregation of small "monopolies". Rather, the market power is a result of the exclusive rights secured by means of the contracts in issue. We do not believe that § 2 applies more to the aggregation of market advantages shown in *Griffith* than to those that exist in this case.

**13.** This case differs from the typical oligopoly or duopoly situation in that only one product has been marketed between two defendants. The Court expresses no view as to whether nonpredatory joint control of a market can result in a "monopoly" where *more* than one product is sold in the market. Cf. *American Tobacco Co. v. U. S.*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

oped it became apparent that the controlling facts of this case were not present in the F.T.C.'s case. The Association's group licensing program and its commercial authorizations did not yet exist in 1965; and the issue of what potential premiums did or did not infringe Topps's rights to sell baseball cards "alone" had not been framed for the F.T.C. in the way it has been here.

Collateral estoppel applies only if "the controlling facts and applicable legal rules remain unchanged." *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 846 (3d Cir. 1974), quoting *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). Circumstances in the baseball card market have changed dramatically and materially since 1965, and the defense of collateral estoppel is therefore unavailable to Topps. Hence, we need not reach the difficult question of whether § 5(e) of the Federal Trade Commission Act makes collateral estoppel unavailable to Topps as a matter of law.[14]

Topps has also raised the equitable defense of unclean hands. Topps alleges that Fleer behaved improperly with respect to the F.T.C. proceeding and should therefore be barred from relief in this case. Even assuming that all of Topps's proposed findings of fact on the unclean hands issue are true,[15] the Court does not believe that they would justify barring Fleer from equitable relief.

### Damages

Fleer has proved that, as a proximate result of the unlawful concerted acts of the defendants, it was denied any meaningful opportunity to compete for the rights to market a baseball card product which would have competed with Topps's standard product. Having proved those facts, Fleer is entitled to some form of relief. One who has sought to compete but who has been prevented from competing by the unlawful acts of others, has suffered *exactly* the sort of "injur[y] to his business or property" which the antitrust laws were designed to remedy. The law does not, of course, guarantee every firm's success in the marketplace. Fleer, however, has been unlawfully prohibited even from *competing.* Its standing is not, in the Court's view, seriously in doubt. Nevertheless, proof of the *fact* of injury sufficient to confer standing under §§ 4 and 16,[16] is not the same as proof of any particular amount of damage sustained. Cf. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

Fleer made a serious effort to show the amount of damages it has sustained because of its exclusion from competition in the market. The Court need not detail all of the ways it examined Fleer's proof to arrive at a plausible estimate of actual damage sustained. See *Zenith Radio Corp. v. Hazeltine Research, Inc., supra.*, 395 U.S. at 123–5, 89 S.Ct. at 1576–77. It is enough to say that, to be recoverable, damages must be in some way provable. Every conceivable valuation of Fleer's losses in this case depends on an unacceptable amount of speculation.

Fleer is not a particularly robust company at the moment. Its sales are roughly a fifth of those of Topps; both companies have been suffering from the introduction of soft bubble gum by larger competitors. Fleer might have made some profit on baseball cards. On the other hand, it might well have lost money.

The object of an award of damages is to place the injured party in the position he would have occupied but for the acts of the defendants. Here, even absent unlawful

---

**14.** § 5(e) of the Act provides that "No order of the Commission ... shall in any wise relieve or absolve any person, partnership, or corporation from any liability under the Antitrust Acts."

**15.** Topps alleges, on somewhat thin evidence, that Fleer intentionally deceived the Federal Trade Commission, and tried to use the F.T.C.'s proceeding improperly for Fleer's commercial advantage. The evidence is dated, equivocal and unpersuasive.

**16.** There is significant dispute in the case law as to whether a lesser showing of injury is required to attain § 16 standing than to attain § 4 standing. Because Fleer has shown that its standing exists both as to past and threatened injury, we need not reach the question.

conduct by the defendants, Fleer would have faced two obstacles between it and its first dollar of profit. First, it would have had to obtain a license from the Association to market a set of cards. Second, it faced the significant market power of a firmly entrenched competitor.

In calculating damages, the Court is willing to assume that, absent the unlawful combination, the Association would have granted Fleer a non–confectionary license for some product. However, it is also reasonably likely that the Association would have charged what the market would have borne for the license, and that the rights would have been expensive. Furthermore, Fleer has never had a great deal of success marketing trading cards of any type (Topps and Donruss are the leaders in the field), and, had it obtained an expensive license, its expertise would have been greatly tested. Fleer's distribution system is not as effective as that of Topps (Topps uses its own sales force; Fleer works through brokers and wholesalers), and Topps could have been expected to have beaten Fleer to the shelves in the spring. Finally, Topps's product has a great deal of market acceptance among retailers and consumers.

We have held that a variety of baseball card products (confectionary and non–confectionary) can be competitive with Topps's product. We cannot conclude, on the present record, that Fleer would have been the company to succeed at the endeavor. The only supportable conclusion is that Fleer should have been permitted to try.

█ In a small number of well–reasoned decisions, courts have awarded nominal damages under § 4 of the Clayton Act where injury–in–fact was shown, but the amount of injury was not capable of calculation. See *Newberry v. Washington Post Co.*, 438 F.Supp. 470, 483 (D.D.C.1977) (Gesell, J.); *Siegfried v. Kansas City Star Co.*, 193 F.Supp. 427 (W.D.Mo.1961), *aff'd* 298 F.2d 1 (8th Cir. 1962). See also *United Exhibitors v. Twentieth Century Fox Film Distributing Corp.*, 31 F.Supp. 316 (W.D.Pa. 1940). Fleer is awarded $1 in damages, which is trebled, pursuant to statute, to $3.

The most compelling reason to award only nominal damages under § 4 of this case is that the result seems particularly fair. By means of equitable relief and an award of attorneys' fees under § 4, Fleer will be placed in essentially the position that it should have occupied before the start of this suit. It will have a fair opportunity to enter the baseball card market, facing both success and failure as possible outcomes. The defendants will be denied further benefits from their unlawful actions, but they will not be assessed treble damages based on guesswork. To the extent that the defendants, as a matter of antitrust policy, should be liable for a dollar figure for excluding *attempted* entry, an award of attorneys' fees will help to vindicate that policy.[17]

## Equitable Relief

█ In shaping equitable relief, the Court is guided by the proposition that the relief granted should remedy those conditions which impede fair competition, without unnecessarily penalizing the defendants.

█ In this case the plaintiff has demonstrated that a combination of exclusive contracts and exclusionary behavior has completely foreclosed entry into a relevant economic submarket. The injunctive relief that the Court will award is intended to lift the existing restraints on free competition without impinging on the ability of either defendant to continue to compete effectively.

It is clear, and has been clear for many years, that the primary obstacles to entry into this market are the rights held by Topps under its contracts with the players. First, the exclusive right to sell cards "alone" forecloses any competitor from selling a baseball card product without a pre-

---

17. Fleer has sought damages only from Topps. The Court has assumed, without deciding, that the plaintiff may seek its full damages against either defendant. The parties may argue any disagreement on that point at the hearing on attorneys' fees.

mium. Second, the exclusive right to sell cards "in combination with chewing gum, candy or confection" forecloses a competitor's use of many of the meaningful premiums with which baseball cards might be sold. Many of the novelty products on a candy rack are sold in combination with some sort of gum or confectionary item, so that the products will attract purchases from those children who want to collect baseball cards *and* eat. Topps's contracts have insured that only Topps is able to market that kind of baseball card combination. Finally, Topps's contractual right to market cards "alone" has extended its market power into the area of non–confectionary premiums. Competitors have only been permitted to market baseball cards with non–confectionary products of sufficient value to avoid infringement of Topps's claimed rights.

Topps's rights to market baseball cards are of course not objectionable insofar as they merely permit Topps to sell players' pictures. Rather, the rights are objectionable because they are exclusive.

By separate Order, Topps will be permanently enjoined from enforcing the exclusivity clause in its form contract, and it will be prohibited from entering into any contract with any major or minor league player that reserves to Topps any exclusive right to sell that player's picture.

Topps will also be permanently enjoined from entering into, amending, or seeking to amend any contract with any major or minor league player so as to expand the scope of the rights now held in its form contract. Topps's form renewals will not be considered amendments, but the term thereof (i. e. two years) may not be enlarged.

The Major League Baseball Players Association will be ordered to consider carefully any applications it receives for licenses to market baseball cards, and it will be required to enter into at least one such licensing agreement before January 1, 1981.[18] Fleer shall have a right of first refusal as to any such license, but only until such time as Fleer is granted a license, or until January 1, 1981, whichever occurs first.

The Players Association shall not grant any exclusive license that will limit any broad category of rights to a single firm. For example, the Association may not grant to any firm an exclusive license to sell baseball cards with any and all non–confectionary products.

Because the commercial authorizations contemplate exclusive licensing, however, the Players Association may enter into exclusive contracts covering sales of cards alone or with carefully and specifically described premiums. The Association may grant, for example, an exclusive license to sell baseball cards with a particular type of plastic team emblem, grape flavored bubble gum, or soft bubble gum, etc.

The Association may of course grant as many baseball card licenses as it chooses to grant.[19]

The Association will not be permitted to consider the revenue it derives from its agreement with Topps in deciding whether to license any baseball card product.

The Association *will* be permitted to continue to enforce its rights to prohibit companies from soliciting group rights on a player–by–player basis. In the baseball card market as it now exists, the Association's group rights are likely to promote rather than inhibit competition, so long as

---

**18.** There was no evidence at trial which suggested that the clause in the commercial authorization prohibiting the Association from including in a group license any player committed by contract to a product competitive with the proposed license (see Finding 19, *supra.*) prevents the Association from licensing a baseball card product competitive with Topps's product. That clause has apparently been construed to limit the Association's group licensing right only where the group picture license is intended to *promote* another product. It has not been construed to prohibit the Association from licensing a company to sell pictures as a principal product.

**19.** The Court has presumed that the Association will hold group rights to license confectionary baseball card products when Topps's rights are made non–exclusive. If that assumption is incorrect, the Association will be required to advise the Court promptly.

licenses to market competitive baseball cards are granted. Were contracting with individual players permitted (i. e. if the Association were prohibited from asserting its exclusive rights under its commercial authorizations), companies would be free to enter into exclusive contracts with individual players, and would be likely to do so. The rights to market baseball cards could become so fragmented that no meaningful competition to Topps would develop.

The Court will retain jurisdiction over the decree for a period of at least three years.

As has been noted

"When the purpose to restrain trade appears ... it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed."

*International Salt Co. v. United States*, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). The relief that will be ordered in conjunction with these findings does *not* close every untraveled road. If, however, either Topps or the Association attempts in some way to circumvent the relief that will be granted, the plaintiff [20] will be free to move for a modification of the Order.

### ORDER

AND NOW, to wit, this 10th day of July, 1980, in accordance with the Findings of Fact and Conclusions of Law entered in the above–captioned case on June 30, 1980, it is hereby Ordered as follows:

1. Defendant Topps Chewing Gum, Inc., is permanently enjoined from:

a. enforcing or threatening to enforce in any court or in any other manner the exclusivity clause in its form contract with major league baseball players;

b. entering into or seeking to enter into any contract with any major or minor league baseball player which reserves to Topps any exclusive right to sell that player's picture in any form or in combination with any product;

c. entering into, amending, or seeking to enter into or amend any contract with any major or minor league player so as to expand or enlarge the scope of the rights now held in its form contracts with major and minor league baseball players;

d. entering into any renewals of its form contracts with any major or minor league player for longer than two years at a time;

e. enforcing or threatening to enforce in any court or in any other manner the term in its form contracts with major and minor league players and/or with the Major League Baseball Players Association, reserving to Topps the right of first refusal as to the marketing of any product.

2. Defendant Major League Baseball Players Association shall:

a. give careful consideration to any applications it receives from persons or companies seeking licenses to market baseball cards;

b. before January 1, 1981, grant at least one license (under its group licensing program) to market a pocket–size baseball card product, to be sold alone or in combination with a low cost premium, in packages priced at 15 to 50 cents, which license shall include the right to use the name and picture of every member of the Major League Baseball Players Association who has signed a commercial authorization contract;

c. grant at least one group license (such as is described in paragraph 2b, *supra.*) to the Fleer Corporation, if the Fleer Corporation, before January 1, 1981, matches any final offer for a group license made by any person or company (in the event that no offers are received from persons or companies other than the Fleer Corporation, the Fleer Corporation shall nevertheless be granted such a license on whatever terms the Major League Baseball Players Association can negotiate under the circumstances);

d. consider granting as part of any group license granted under paragraph

**20.** We will not speculate on whether any other competitors might have standing to object to continued anti–competitive conduct by the defendants.

[redacted]

2b, *supra*, the right to sell baseball cards alone (subject to any proceedings conducted under paragraph 2e, *infra*.)

e. advise the Court within ten days of the date of this Order whether the Major League Baseball Players Association will, under the terms of its commercial authorization contracts with its members, exercise the rights to consider applications for licenses, and to license any company to sell baseball cards alone or in combination with gum, candy or confection;

f. maintain at least one group license (such as is described in paragraph 2b, *supra*.) in effect for every baseball season in which the Major League Baseball Players Association conducts its group licensing program.

3. Defendant Major League Baseball Players Association is permanently enjoined from:

a. considering any revenue either it or its members derive from its royalty contract with Topps Chewing Gum, Inc. (trial exhibit P–1), in deciding what group licenses to grant under paragraph 2b, *supra*;

b. entering into any exclusive licensing agreement for the sale of baseball cards, except that it may grant exclusive licenses (exclusive in the sense that they may be the only ones of their kind issued by the Major League Baseball Players Association) to sell baseball cards with carefully and specifically described premiums in such a manner as not to vest in any company or companies the exclusive right to sell baseball cards with any general type of premium, including, but not limited to, bubble gum, chewing gum, candy or non–confectionary items.

c. entering into any contract or licensing agreement whether designated "exclusive" or otherwise, which would diminish any non–exclusive rights held by Topps Chewing Gum, Inc.

4. In the event that Fleer Corporation, as of January 1, 1981, has not been granted a license under the terms of paragraph 2c, *supra*., the Court will hold a hearing to determine whether the Fleer Corporation has been accorded as complete and fair an opportunity to enter the baseball card market as it would have enjoyed but for the defendants' unlawful conduct, and the Court will at that time grant appropriate relief if such relief is warranted.

5. Topps Chewing Gum, Inc. may continue to enforce its right to prohibit any player from granting to another any of the rights held in Topps's form contract until Topps's final appeals have been exhausted, except that Topps may not oppose in any court or in any manner any player's granting similar or identical rights to the Major League Baseball Players Association (see paragraphs 2e, 3c, *supra*.).

6. In the event that the Major League Players Association does not believe itself to hold the rights to license baseball cards alone or in combination with gum, candy or confection (see paragraph 2e, *supra*.), the Court will shape such injunctive relief as is required to ensure that meaningful competition as to such products will be possible.

7. The Court will retain jurisdiction over the implementation of this Order for a period of three years, which period is subject to extension (upon proper application) if circumstances warrant.

AND IT IS SO ORDERED.