FLEER CORPORATION, Appellant in Nos. 80–2537, 81–1104 and Appellee in Nos. 80–2538, 80–2539,

v.

TOPPS CHEWING GUM, INC., et al., Major League Baseball Players Association,

Topps Chewing Gum, Inc., Appellee in Nos. 80–2537, 81–1104 and Appellant in No. 80–2538,

Major League Baseball Players Association, Appellee in Nos. 80–2537, 81–1104 and Appellant in No. 80–2539.

Nos. 80–2537 to 80–2539 and 81–1104.

United States Court of Appeals, Third Circuit.

Argued May 18, 1981.

Decided Aug. 25, 1981.

Rehearing and Rehearing In Banc Denied Oct. 22, 1981.

Bernard G. Segal (argued), James D. Crawford, Arlene Fickler, David G. Battis, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Sidney Harris, New York City, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Topps Chewing Gum, Inc.

Harold F. McGuire, Jr. (argued), Walter Barthold, Barthold & McGuire, New York City, Norman M. Berger, Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., Donald M. Fehr, New York City, for Major League Baseball Players Ass'n.

Matthew M. Strickler (argued), Linda S. Martin, Frederick L. Ballard, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Fleer Corp.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This case involves the production and sale of major league baseball trading cards in alleged violation of sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 & 2 (1976). Appellee, Fleer, commenced suit in 1975 against appellants, Topps, and the Major League Baseball Players Association (MLBPA), claiming that appellants excluded effective competition in the sale of baseball trading cards through a series of interlocking exclusive licensing contracts. The contracts at issue were Topps' individual licensing agreements with each player in the major and minor leagues; the commercial authorization contract between the MLBPA and the individual major league players; and a 1968 agreement between

Topps and the MLBPA which constituted a renegotiation of players' earlier contracts with Topps. The district court found these interlocking agreements to foreclose competition in all but a small portion of the relevant market. Nominal damages were awarded against Topps, but the district court granted injunctive relief that required Topps to assign its exclusive publicity rights to the MLBPA. In turn, the Association was to grant at least one non-exclusive license for the production of baseball cards before January 1981. Because we hold that the three agreements in question were neither unreasonable restraints of trade under section 1 of the Sherman Act, nor monopolization of the relevant market under section 2, we will reverse the judgment of the district court.

I.  FACTS

A.  The Parties

Appellee, Fleer Corporation, manufactures and sells bubble gum and other confections. In the late 1950's and early 1960's Fleer sold baseball trading cards in combination with gum as well as other non-sport (editorial) trading cards.[1] Prior to 1966, Fleer had individual licensing agreements with several major league baseball players that authorized the production and sale of baseball trading cards. Fleer sold all of these contract rights to Topps in 1966.

Appellant, Topps Corporation, also manufactures and sells bubble gum, candy, and novelties.[2] In 1956, Topps acquired the exclusive license to a large number of baseball players' photographs and statistics through an agreement with Bowman Gum Company. Topps is presently the only seller of

baseball cards sold in combination with bubble gum in the United States.

The MLBPA is a labor organization whose primary responsibilities are to negotiate, administer, and enforce collective bargaining agreements between the players and the team owners. The Association is also the players' exclusive marketing agent for publicity rights when these rights are sold as part of a group series.

B.  Background

The products at issue are baseball trading cards: the familiar 2½″ by 3½″ cards with the name and picture of one player, in team uniform, on the front, and his career statistics and personal information on the back.[3] Baseball trading cards were first sold in conjunction with chewing tobacco and cigarettes at the end of the nineteenth century and were included later as a treat with chewing gum and other confections. Since first introduced, baseball trading cards have developed quite a following among baseball fans. As the district court noted:

> For decades, they [baseball cards] have been an important and distinctive part of many childhoods . . . Cardboard, wallet-size pictures of active major league players have existed for generations. Even if the product was merely a casual idea of a long-forgotten promoter in the 1880's, and even if there are hundreds of variations and substitutes which logically might exist, the concept is now so embedded that baseball cards literally define themselves.

*Fleer Corp. v. Topps Chewing Gum, Inc.,* 501 F.Supp. 485, 497 (E.D.Pa.1980).

Topps began to market baseball cards with bubble gum in 1949. At that time,

---

1.  Fleer's best known products are "Double Bubble" bubble gum and "Gatorgum." Fleer's editorial cards depicted various Hollywood personalities and fictional characters.

2.  Topps' best known product is Bazooka bubble gum, but the company also produces "Krypton Gum," "Garbage Candy" and a variety of editorial trading cards. Topps also markets football, basketball and hockey cards which, like baseball cards, are sold only during the season in which the sport is played.

3.  Baseball trading cards, along with other sports trading cards, are marketed either in a trading pack consisting of 14 baseball cards and a piece of gum or in "Rack Packs" or vending packs in which up to 500 baseball cards are sold alone. The majority of cards cover a single player. Some, however, depict various groups such as, All-Stars, rookies, and entire professional teams. In addition, there are cards picturing team managers and trainers as well as "check list" cards which permit fastidious collectors to order their acquisitions.

Bowman Gum Corporation had a predominate position in the baseball card market by virtue of its numerous publicity contracts with major league players.[4] These contracts gave Bowman the exclusive right to use a player's photograph in connection with the sale of gum. In 1953, when Topps introduced trading cards depicting players under exclusive contract to Bowman, the latter, through its parent corporation, commenced suit for infringement. The Second Circuit, in *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953), held that Topps' publication both infringed on Bowman's contractual rights and violated the players' exclusive right to control their own publicity. Topps was forced to withdraw the infringing cards.

Three years after this decision Topps purchased all of Bowman's player contract rights, and Bowman left the trading card market altogether. In addition, during this period, Topps began a vigorous program of signing individual standard form contracts with thousands of both major and minor league baseball players. Under these agreements, each player granted Topps an exclusive right to publish his name, picture, signature and biographical sketch "to be sold either alone or in combination with chewing gum, candy and confection or any of them." As consideration, Topps guaranteed the player a lump-sum payment of $125 for each season in which either his picture was used or the player was an active member of a major league club. These contracts ran until Topps had made five years of payments to the individual player.

In 1965, the Federal Trade Commission filed an administrative complaint against Topps claiming that its aggregation of individual exclusive contracts violated section 5 of the FTC Act. 15 U.S.C. § 45 (1976); *Topps Chewing Gum, Inc.*, 67 FTC 744 (1965). After a hearing, an examiner ruled against Topps, but on appeal the Commission reversed. It held that Topps' exclusive license to publish players' photographs and statistics on trading cards was limited in scope and hence lawful. The Commission stressed that Topps' limited exclusive licenses did not prohibit the sale of trading cards with other low cost products such as marbles, cookies, or powdered softdrinks. Therefore, competition for baseball trading cards existed when the cards were sold in conjunction with products other than gum. *Id.* at 859.

Until the FTC's decision, Fleer competed with Topps by obtaining a similar aggregation of player publicity licensing agreements. Indeed, in the early 1960's Fleer sold two sets of trading cards known as "Baseball Greats." After the FTC's 1965 ruling, however, Fleer abandoned the baseball market and focused on other sports and editorial cards. In 1966, it sold all its player publicity licenses to Topps for $395,000.

Since 1966, Topps has accumulated the vast majority of exclusive licensing agreements with the players. By virtue of these contracts, Topps is the sole manufacturer of baseball trading cards sold in conjunction with bubble gum. Since 1966, however, baseball trading cards have accompanied a variety of other non-confectionary products. This was due, in large measure, to the development of the MLBPA.

## C. Development of the MLBPA and Group Licenses

When the MLBPA hired its first executive director, Marvin Miller, in 1966, the Association suffered from an acute lack of funds. In order to raise operating capital, Miller developed the idea of a group licensing program whereby all of the players would authorize the Association to market their pictures and signatures when they were distributed as part of a group series. The first such group license was granted to Coca-Cola. It called for a series of 500 player pictures to be placed on the underside of bottlecaps. The royalties from this

---

4. In the late 1940's and early 1950's there were many competing bubble gum manufacturers in the trading card market. They included Bow- man, Fleer, Leaf Chewing Gum, Philadelphia Chewing Gum, and Topps.

project funded the operating expenses of the Association and solved the immediate fiscal crisis. Although Miller planned to terminate the program, the players liked the extra income and persuaded Miller to retain the system even after the Coca-Cola agreement had expired.

Under this group licensing program, which became known as the commercial authorization contract, each player remained free to market the personal rights to his name, likeness, and signature when used individually, but only the MLBPA could contract for the players as a group. The players were not required to sign the commercial authorization contract, but most did.[5] From 1966 to 1975, the MLBPA entered into group licensing contracts with Kellogg, Sports Promotions, Milk Duds, and ITT Continental Baking among others. The number of players included in the licensing agreement has varied. Some contracts (Coca-Cola and Kellogg) covered all major league players; others extended to "not less than 72, and not more than 300."

Topps' trading cards, along with various bat and glove manufacturers, were not subject to the group licensing restrictions of the commercial authorization contract. This exemption existed because under the terms of the commercial authorization program, the MLBPA group licensing agreement extended only to publicity rights that had not already been conveyed.[6] Since all players were under exclusive contract to Topps by the time they reached the majors, the Association could not license publicity rights for baseball cards sold alone, or in combination with gum, candy or other confection.

After the Coca-Cola project resolved the Association's immediate funding crisis, the MLBPA initiated membership dues to finance operating expenses.[7] Thereafter, all commercial authorization royalties were distributed directly to the players. The Association, for administrative purposes, did receive the licensing income, but merely as a conduit that distributed all of the licensing revenue to the players. These royalties were never used to cover MLBPA expenses.

### D. *The 1968 Agreement*

In 1966, when Marvin Miller first learned of the Topps' individual player licensing agreements, he met with Joel Shorin, president of Topps, and attempted to increase the players' compensation under these agreements. Topps rebuffed Miller's attempts to renegotiate, stating that since Fleer had sold its rights in 1966, Topps had all major league players under contract and in short, Shorin told Miller: "I don't see your muscle." In an attempt to gain some bargaining leverage, Miller persuaded the players, through the MLBPA's executive board, to adopt a policy of not signing renewals to Topps' individual licensing agreements.

In addition, Miller attempted to enhance his bargaining position by offering Fleer an opportunity to purchase similar exclusive publicity rights. In 1968, Miller presented Fleer with a proposal that, for $600,000, would give Fleer exclusive rights, beginning in 1973, to market baseball cards sold with gum for 80% of the baseball players. Under this proposal, Fleer would not have to pay any money until 1973 and even then no funds were due unless Miller delivered 80% of the players' exclusive licenses. Al-

---

5. Group licenses were negotiated by Marvin Miller or the MLBPA's licensing subagent, subject to the approval of the Association's executive board or licensing committee. These commercial authorization contracts lasted three years and renewals were obtained by the team's player representative to the Association.

6. The operative language in the commercial authorization contract which excluded Topps' rights from the coverage of the MLBPA stated: "Any group licensing contract entered into with any individual company for the promotion

of its products, shall exclude players who are committed by contract to competitive products." Hence, the MLBPA was without authority to grant any group licenses for trading cards sold alone or with gum.

7. The MLBPA began a voluntary "Dues Checkoff" system in 1967. Under this agreement the major league teams withheld an amount from each player's salary for each day of his service, and then remitted that amount to the MLBPA.

ternatively, the Association asked Fleer if it would be interested in the immediate rights for all players' trading cards sold with a product other than gum. Fleer rejected both offers, claiming it was only interested in cards sold with gum, and that 1973 was too far in the future.

Meanwhile, the Executive Board's decision to adopt a policy of non-renewal began to produce results. The players complied with the decision and refused to sign extension agreements with Topps. When this occurred Miller obtained concessions in the scope of Topps' individual agreements and the remuneration offered to the players. On November 18, 1968, the Association reached a new agreement with Topps that modified all then existing individual agreements with the players.

The terms of the 1968 agreement increased the players' lump sum license payments from $125 to $250 per year. In addition, if the revenues collected exceeded this amount, each player received a pro rata share of 8% of Topps' sales up to four million dollars and 10% of Topps' sales over four million. If the Association were to be presented with a competitive licensing proposal that might infringe on Topps' exclusive right to baseball cards sold alone or with gum, Topps promised to notify the Association as to whether it would release its rights. Topps also reserved a right of first refusal as to any merchandising proposal that included player pictures larger than 5″ × 7″. In return, the MLBPA promised it would not "interfere with Topps' contracts, its procurement of such contracts or its policy" for eight years. Under the 1968 agreement, all publicity royalties went to the players on a pro rata basis. In 1974, a detail was changed so that Topps paid any excess over the $250 minimum to the MLBPA. The Association, again acting solely as a conduit, distributed these amounts in the same fashion as the licensing revenues under the commercial authorization contracts.

After the signing of the 1968 agreement, the MLBPA granted several licenses to merchandisers for the production and sale of baseball trading cards. These licenses covered the sale of baseball cards with cereals, candy, and novelties. The MLBPA also licensed the sale of trading cards with cheap non-confectionary novelties, often referred to as "sham products." Topps objected to such licenses in principle because their marketing was tantamount to the sale of baseball cards alone, and hence an infringement of Topps' exclusive rights. Nevertheless, in 1969 the MLBPA granted Sports Promotions, Inc., a license to market trading cards with cheap novelty rings, iron-on patches, and similar novelties so long as the value of the novelty represented half of the total retail value. In the spring of 1970, Topps learned of this promotion and complained to the Association that its rights had been infringed. The MLBPA disagreed and managed to secure a letter agreement in which Topps did not object to the promotion for one full baseball season. The MLBPA issued several other trading card licenses during the 1968–1976 period; some of these were also over the objection of Topps.[8]

### E. Fleer's 5″ × 7″ Proposal

In 1974, Fleer made an attempt to re-enter the baseball trading card arena by submitting a written proposal to the MLBPA seeking the publicity rights to market 5″ × 7″ stickers, patches, cards, iron-ons, and photographs for sale with or without bubble gum. Miller received the proposal but admonished Fleer that sales with gum could not be included because of Topps' rights and that sales of decals and iron-ons had already been licensed to another company, Seeko. Fleer made these changes and submitted a revised proposal.

Because Fleer's offer covered the sale of 5″ × 7″ patches and cards, Topps' had a

8. In 1972–73 the MLBPA granted a license to Madaras, Inc. and Pasco, Inc. of Winona, Minnesota, under which those companies sold various baseball novelties including picture packs. Topps objected to these sales but the MLBPA persuaded Topps to waive its rights. In addition Topps waived any objections to a proposal from Pro-Stars, Inc. of Canada, which included the distribution of player postcards.

right of first refusal under the 1968 agreement. Joel Shorin, President of Topps, later advised Miller that Topps would not exercise its right of first refusal on Fleer's offer. In addition, however, Shorin counseled that Fleer's proposal was probably not worthwhile. Topps' prior experience with baseball novelties indicated that these items tended to stay on the shelf and thereby inhibited retailers from purchasing other baseball-related items. Shorin discussed the possibility that Fleer's products might depress the sales of trading cards and decrease the players' royalties from trading cards because of depressed sales. No one, however, asked the Association to reject Fleer's proposal. (Joint Appendix at 542–43).

Miller presented both Fleer's proposal and Topps' criticism of it to the players' executive board for its consideration. The Board unanimously rejected Fleer's offer fearing that it might decrease their royalties from Topps. In addition, Fleer's offer guaranteed only $25,000 in royalty payments but projected over one million in annual sales. The executive board was skeptical of marketing plans that offered little guaranteed payments with promises of windfall royalties from as yet unrealized sales.

By April of 1975, Fleer had dropped the idea of a 5″ × 7″ proposal. Miller suggested several changes that might secure the Board's permission to license the product, but Fleer declined to modify its stance. Fleer's president, Donald Peck, met with Joel Shorin on April 17, 1975, and threatened suit unless Topps granted Fleer the rights to sell player pictures on stickers, stamps, and decals. Shorin refused and Fleer approached the MLBPA about joining in its suit against Topps. The Association declined and Fleer filed a complaint in the Eastern District of Pennsylvania naming the MLBPA as a co-conspirator with Topps in a suit for violation of sections 1 and 2 of the Sherman Act.[9]

## II. DISTRICT COURT'S OPINION

### A. Relevant Market

The district court's first task was to determine the relevant market by which to judge the alleged violations of the Sherman Act. Guided by the criteria outlined in *Brown Shoe Co. Inc. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), the district court found the relevant market for antitrust purposes to be: "pocket-size pictures of active major league baseball players, sold alone or in combination with a low cost premium, at a price of 15 to 50 cents." *Fleer*, 501 F.Supp. at 504. In reaching this finding, the district court stressed the unique history of baseball cards and the public's awareness of baseball trading cards as a discrete market.

### B. Section 1 Claim

Within this narrowly defined market, the court began its analysis of Fleer's section 1 claim by noting that to enter the baseball trading card market, one must either compete directly with Topps for an aggregation of exclusive player licenses or seek a group license under the MLBPA's commercial authorization program for the right to market

---

9. 15 U.S.C. § 1 (1976) provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 (1976) provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

baseball cards with a non-confectionary premium. The court found that direct competition with Topps for individual player contracts was all but foreclosed because Topps had exclusive contracts with every individual major league player. In addition, under this method of competition, only the minor league players—who had not signed with Topps and were not yet eligible for the MLBPA—were in a position to grant licensing contracts. It would take several years of contracts with the minor league players before enough reached the majors and created an alternative series of baseball trading cards. Hence, a rival manufacturer could not market a competitive product for several years.

The district court went on to find that competition for trading cards sold with non-confectionary goods was shut off by the Topps—MLBPA agreement of 1968. To obtain a license for non-confectionary products a competitor must submit a proposal under the commercial authorization program of the MLBPA. But the district court found that the Association refused to grant licenses for the sale of baseball cards with low cost premiums for two reasons. First, the MLBPA feared that licensing the sale of baseball cards with low cost or "sham" products would be tantamount to sales of baseball cards alone, and hence a violation of Topps' rights. Second, the court found that the Association was reluctant to license competing baseball card products for fear of diminishing Topps' bubble gum royalties. The foreclosure of the market was insured by the royalty provisions of the 1968 agreements, as well as by the MLBPA's promise not to interfere with Topps' acquisition of exclusive contracts with minor league players or renewal contracts with major league players.

The district court viewed this network of contracts—the 1968 agreement, the MLBPA commercial authorization program, and Topps' license agreements with the individual players—as an unreasonable restraint of trade in violation of section 1 of the Sherman Act.

## C. Section 2 Claim

The district court then turned to Fleer's section 2 claim and held that "[f]or virtually the same reasons that the defendants have been found to have violated § 1 of the Sherman Act, they are also liable under § 2." *Fleer*, 501 F.Supp. at 511. Specifically, the court found the defendants involved in a conspiracy to monopolize the baseball trading card submarket. The court did not address the issue of the appellants' specific intent to monopolize, but held instead that appellants' actual exercise of monopoly power supported a finding of conspiracy to monopolize.

## D. Damages and Injunctive Relief

While in the district court's view Fleer proved the fact of injury sufficient to confer standing, the court held that it failed to prove the amount of damage caused by the anticompetitive restraint with any specificity. Hence, it awarded nominal damages of one dollar, but fashioned a broad program of equitable relief in an effort to place Fleer in essentially the same position it should have been before the suit: a company with "a fair opportunity to enter the baseball card market, facing both success and failure as possible outcomes." *Id.* at 514.

In order to achieve this purpose, the court fashioned an injunction that prohibited Topps from: a) enforcing the exclusivity clause in its agreements with the individual baseball players or entering into any new exclusive agreements with the players; b) entering into any renewal contracts with players for longer than two years; and c) enforcing its right of first refusal on competitive bids submitted to the MLBPA.

The MLBPA was required, in turn, to grant at least one non-exclusive license to market baseball trading cards either alone or with a non-confectionary premium before January 1, 1981. In addition, at least one group license was to be given to the Fleer corporation, if they matched the offer of any competing merchandiser. The MLBPA was enjoined from considering any

revenue they might derive from Topps' products when making future decisions on whether to grant group licenses of baseball card rights.

Both Fleer and Topps appealed. Fleer seeks to expand the injunction to bar Topps from the baseball card market for at least one season, and to require Topps to deal with the Association rather than through its exclusive player agreements. In addition, Fleer seeks to have the district court's award of nominal damages reversed and the case remanded for further findings on the damages issue. Topps appeals the findings of liability, damage award, and injunctive relief. We have appellate jurisdiction to review the district court's judgment under 28 U.S.C. § 1292(a)(1) (1976).[10]

## III. *DISCUSSION*

### A. *Section 1 claim*

Read literally, section 1 of the Sherman Act proscribes every agreement "in restraint of trade." 15 U.S.C. § 1 (1976). Yet, as Justice Brandeis recognized in *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), "[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Id.* at 238, 38 S.Ct. at 243. Consequently, the Supreme Court has developed a "rule of

reason" standard which proscribes only those agreements that restrain trade unreasonably. *See Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1344 (3d Cir. 1975). The rule of reason analysis scrutinizes the purpose and competitive effect of each agreement to determine its lawfulness. *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n.13, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978) (purpose and effect are linked disjunctively in antitrust analysis); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (the effect of the restraint on competition is important for rule of reason analysis).[11]

In this circuit, to sustain a claim under section 1 the plaintiff is required to prove:

(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Martin B. Glauser*, 570 F.2d at 81.[12] For purposes of our review, we assume but do not decide the correctness of the district

---

**10.** The district court reserved the issue of attorneys' fees.

**11.** The Court has also, for certain evidentiary and administrative purposes, identified certain *per se* restraints "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Unless the particular restraint falls within one of these *per se* categories its legality must be examined under the rule of reason analysis. *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 82 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).

**12.** Fleer contends that the cumulative effect of all three agreements—the 1968 contract, the commercial authorization program, and Topps'

individual contracts with the players—was to restrain trade unreasonably in the baseball card market. Technically, only the 1968 agreement, between named defendants MLBPA and Topps, could support a section 1 violation because the court could only make a finding of concerted action involving these parties. *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1074 (3d Cir. 1978). All other agreements involved each major league player, none of whom were named as defendants in this action. Consequently, our review should be limited to evaluating the purpose and effect of the 1968 agreement. Nevertheless, we will review the commercial authorization program and Topps' individual licensing agreements in order to evaluate Fleer's contention that the combined effect of these interlocking agreements constituted a violation of section 1.

court's definition of the relevant product market.[13]

■ The district court correctly characterized this restraint as one to be examined under the rule of reason.[14] The criteria for scrutinizing the legality of a restraint under the rule of reason were best catalogued by Justice Brandeis in *Chicago Bd. of Trade*:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

246 U.S. at 238, 38 S.Ct. at 247. In this case the "facts peculiar to the business," and the "history of the restraint" are crucial. Specifically, each player's exclusive right of publicity and its effect on the trading card market, is central to our analysis.

The exclusive right of major league baseball players to control the form and frequency of their commercial publicity has been long established. Ironically, the landmark case in this area, *Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F.2d 866 (2d Cir. 1953), involved the same defendant and a similar dispute over exclusive rights to sell baseball trading cards. In that case, plaintiff, a trading card manufacturer, had signed exclusive licensing agreements with several major league baseball players. Topps, a rival trading card manufacturer at the time, deliberately induced these players to grant overlapping trading card rights to Topps. Haelan sued to enjoin Topps' actions and have the players' subsequent assignment of publicity rights declared void. The Second Circuit upheld Haelan's exclusive licenses and thereby established a new "right of publicity" independent of any privacy concepts which had constrained prior courts. *See* Gordon, *Right of Property in Name, Likeness, Personality and History*, 55 Nw.U.L.Rev. 553, 570–601 (1960).

In so doing, the *Haelan* court held that a major league baseball player's right of publicity was both exclusive and assignable. We think that, in addition to and independent of that right of privacy . . . . a man has a right in the publicity value of his photograph, *i. e.*, the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made "in gross," *i. e.*, without an accompanying transfer of a business or of anything else . . . .

> This right might be called a "right of publicity." For it is common knowledge that many prominent persons (especially actors and ballplayers), far from having their feelings bruised through public exposure of their likenesses, would feel

---

**13.** The definition of a relevant product market is a necessary element of either a section 1 or 2 violation. *Columbia Metal Culvert Co. Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 26–27 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). A finding of liability under section 1—except where cases fall within the *per se* category—presupposes the determination of a market place by which to evaluate the restraint's effect of competition. *United States v. E. I. du Pont De Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). But the relevant market inquiry under sections 1 and 2 is not identical. As Judge Adams distinguished in *Columbia Metal*, "The § 2 market definition looks to the existence of competitors as evidence of countervailing power which would preclude monopoli-

zation. § 1, in contrast, is concerned with patterns of competition as a means of judging whether a restraint of trade is unreasonable." *Columbia Metal*, 579 F.2d at 27 n.11. *See also American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248 (3d Cir. 1975).

**14.** At trial, Fleer argued that Topps' and the Association's activity amounted to a group boycott and was consequently *per se* illegal under the holding in *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Since there has been no concerted refusal to deal by a group of competitors in that business, the facts of this case do not support a group boycott claim. *Fleer*, 501 F.Supp. at 509.

sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, buses, trains, and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures.

*Id.* at 868.

The Supreme Court has recognized such an exclusive right of publicity and analogized its effect to the protection afforded by the patent and copyright laws. *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 575–76, 97 S.Ct. 2849, 2857–58, 53 L.Ed.2d 965 (1977). In *Zacchini*, the Court held that petitioner's 30 second human cannonball act could not be filmed in its entirety by the local news media and then reproduced on the evening news. In so ruling the Court stated that, like copyright and patent laws, the right of publicity was " 'intended definitely to grant valuable, enforceable rights' in order to afford greater encouragement to the production of works of benefit to the public." *Id.* at 577, 97 S.Ct. at 2858 (citations omitted).

This circuit recognized the right of publicity not long after the landmark *Haelan* case. In *Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481, 486 (3d Cir.), *cert. denied*, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956), we held that a prize fighter who licensed the motion picture rights to his prize fight retained a right of publicity over the television rebroadcast of the same movie. In upholding plaintiff's cause of action for damages against the television broadcaster, Chief Judge Biggs stated:

> There are, speaking very generally, two polar types of cases. One arises when some accidental occurrence rends the veil of obscurity surrounding an average person and makes him, arguably, newsworthy. The other type involves the appropriation of the performance or production of a professional performer or entrepreneur. Between the two extremes are many graduations, most involving strictly commercial exploitation of some aspect of an individual's personality, such as his name or picture.

*Id.* (footnotes omitted).[15] It is against this backdrop that we examine the purpose and anticompetitive effect of the appellants' contracts, individually and as an interlocking network, on the baseball trading card market.

■ In 1966, Topps began an assiduous program of obtaining exclusive license agreements with every major and minor league baseball player. Fleer attempts to distinguish these contracts from those upheld in the *Haelan Laboratories* case by emphasizing that Topps' present agreements involved all major league players and contained long terms with staggered termination dates. We are unpersuaded by such differences. Merely because Topps, through individual contracts with every minor league player, managed to obtain license agreements with all major league

---

**15.** Other circuits have applied the exclusive right of publicity to other professions. *See Memphis Development Foundation v. Factors Etc., Inc.*, 616 F.2d 956 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980) (exclusive right of publicity for an entertainer is not inheritable); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 220 (2d Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) (right of publicity is assignable during public figure's lifetime); *Motschenbacher v. R. J. Reynolds Tobacco Company*, 498 F.2d 821, 826–27 (9th Cir. 1974) (race car driver's right of publicity enforceable even though his facial features are not identifiable); *Cepeda v. Swift and Company*, 415 F.2d 1205,

1206 (8th Cir. 1969) (baseball star's right of publicity assignable in its entirety).

The Supreme Court has identified several rationales for awarding entertainers and professional athletes a right of publicity:

> The rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay.

*Zacchini*, 433 U.S. at 576, 97 S.Ct. at 2858, *quoting*, Kalven, *Privacy in Tort Law—Were Warren and Brandeis Wrong?*, 31 *Law & Contemp.Prob.* 326, 331 (1966).

players does not make the aggregation of these contracts an unlawful combination in restraint of trade. *Cf. Automatic Radio Manufacturing Co. Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 834, 70 S.Ct. 894, 898, 94 L.Ed. 1312 (1950) ("The mere accumulation of patents, no matter how many, is not in and of itself illegal."); *L. G. Balfour Company v. FTC*, 442 F.2d 1, 16 (7th Cir. 1971) (mere accumulation of trademarks does not constitute unlawful monopolization).[16] Fleer chose to leave the trading card market in 1966 and sold all its existing licensing agreements with major league players to Topps. That Topps has managed to retain those contracts and sign minor league players does not make these agreements, in and of themselves, unreasonable.

The accumulation of exclusive licenses was also addressed by this court in *Lawlor v. National Screen Service Corp.*, 270 F.2d 146 (3d Cir. 1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960). In *Lawlor*, eight motion picture producers granted National Screen an exclusive license to manufacture and distribute promotional accessories for their first run films. Plaintiff, a competing distributor, contended that National Screen's accumulation of licenses prevented effective competition and hence violated the antitrust laws. This court held that an accumulation of exclusive licenses is not a violation of the Sherman Act because a rival film accessory distributor could always compete against National Screen for subsequent contracts with motion picture producers.[17] Similarly, in our case, Fleer or any other trading card manufacturer, may compete with Topps for minor league players or even persuade the present major league players not to renew their Topps' contracts. In both cases, the licenses involved products which do not compete against each other. Hence, their accumulation does not prevent a rival manufacturer from entering the market and does not operate as a restraint of trade.

In addition, Fleer admits that while it could compete against Topps for license agreements in the minor leagues, it would be several years before such a strategy produced a marketable product. But this argument simply identifies a characteristic of major league baseball, rather than an illegal restraint of trade. The length of time it takes for these minor league contracts to produce a marketable series of major league cards is a function of the minor league farm system in baseball, not an indictment of Topps' licensing agreements. Not all minor league players reach the majors and those fortunate few often wait many years for the opportunity. Such a system ensures that it will be several years before there is a large market for the cards depicting minor league players. Hence, Fleer's claim that Topps' dominance precludes rapid entry into the market misses the mark. A rival competitor may not be able to obtain major league players already under contract to Topps, but it can still compete for player licenses in the same forum in which Topps secured its present licensing agreements: the minor leagues. That such a program of head to head competition might take six or seven years to bear fruit does not make Topps' agreements anticompetitive; it is simply a function of modern-day baseball, one which we are required to consider in any rule of reason analysis. *Chicago Bd. of Trade*, 246 U.S. at 238, 38 S.Ct. at 243.

After careful examination, Topps' exclusive licensing agreements cannot be said to restrain trade unreasonably. A rival manufacturer could compete head to head with

---

16. *See also Lawlor v. National Screen Service Corp.*, 270 F.2d 146, 154 (3d Cir. 1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960) (mere accumulation of copyright licenses is not an antitrust violation).

17. The major film producers in *Lawlor* were under 5 year exclusive agreements to National Screen, similar to Topps' agreements with the players. In addition, the *Lawlor* court stressed that the plaintiffs, had never attempted to compete with National Screen by obtaining their own exclusive licenses from the film producers. *Lawlor*, 270 F.2d at 154. Similarly, although in the market until 1966, Fleer never attempted to compete directly with Topps for minor league players. Indeed, Fleer rejected a 1968 offer by Marvin Miller for 80% of the players' exclusive licenses by 1973.

Topps by seeking licenses with minor league players. The lag time required to enter the market with a competitive series of trading cards is due in significant measure to the structure of organized baseball. In addition, Topps' aggregation of licenses was enhanced by Fleer's sale of its player licenses in 1966.

◼ The MLBPA's commercial authorization program was the second crucial link in the agreements among defendants which allegedly foreclosed competition in the trading card market. Far from being a restraint of trade, the commercial authorization agreement is pro-competitive. It allows the players to negotiate as a single entity with merchandisers and thereby set up a wide variety of baseball novelty items. If every potential retailer had to contract with each player individually for a group license, few licenses would exist. By streamlining the negotiation process the commercial authorization program allows for increased competition in the trading card market. Several agreements for the sale of trading cards with non-confectionary goods were consummated after the implementation of a commercial authorization plan. The validity of such a common agent for the licensing of the players as a group has been established. *See K–91, Inc. v. Gershwin Publishing Corp.*, 372 F.2d 1, 4 (9th Cir. 1967), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968) (ASCAP, common agent for over 8,000 musicians, held not to be an agreement in restraint of trade). *See also Broadcast Music, Inc. v. Columbia Broadcasting System Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

The 1968 agreement between Topps and the MLBPA was the third link in appellants' agreements. The district court found that while the 1968 agreement was not anticompetitive on its face, when combined with the commercial authorization program

and Topps' individual licenses, its effect was to foreclose all meaningful competition for baseball trading cards. The court reasoned that since Topps' individual licensing agreements precluded the sale of trading cards alone or in combination with a confection, the only remaining market for cards was to sell them with a low cost non-confectionary premium. Such competition was effectively closed, however, by the combined effects of the commercial authorization contract and the 1968 agreement. The commercial authorization program required any trading card series to be cleared through the MLBPA in order to obtain a group license. Yet, because the 1968 agreement tethered the players' royalties to a percentage of Topps' sales, the MLBPA was unwilling to grant licenses to products that might compete with Topps and thereby decrease any royalties. Hence, the district court found that "[b]ut for P–1, [the 1968 agreement] some low cost non-confectionary or other competitive item would eventually have been licensed by the Association." *Fleer*, 501 F.Supp. at 509. There is no support in the record for this finding.

Aside from the 1968 contract, there is no evidence of concert of action between Topps and the Association. An examination of licenses granted by the Association for the sale of trading cards with non-confectionary goods demonstrates that the fear of decreased royalty payments did not stop the Association from licensing products competitive with Topps. In 1968, the Association licensed Sports Promotions to sell baseball trading cards with a novelty ring. The license required that the novelty constitute one-half the value of the package's total cost so that it would not be considered a sham product, and hence an infringement on Topps' license to sell the cards alone. Such a license is competitive with Topps and does not run afoul of the antitrust laws.[18]

---

**18.** The MLBPA's fear of trademark infringement is a legitimate concern in this context. The Sherman Act does not require a licensor to test the boundaries of trademark infringement when making decisions about licensing compet-

itive products. As this court said in *American Motor Inns*:

> In a rule of reason case, the test is not whether the defendant deployed the least restrictive alternative. Rather the issue is whether the restriction actually implemented

The 1968 Sports Promotions license was by no means unique. In 1970, over Topps' protest, the Association granted Sports Promotions a license to market 3-dimensional baseball cards in conjunction with inexpensive iron on patches. The MLPBA resisted Topps' attempt to stop the license and indeed, secured a letter in which Topps agreed to waive any claims it might have against Sports Promotions. The Sports Promotions license was discontinued after one year, but this was due to the licensee's failure to meet the royalty payments guaranteed in the license agreement. Other licenses, arguably infringing on Topps' rights, or at least involving a competitive product, were granted by the Association under the commercial authorization program.[19]

Turning to the 1968 agreement, far from being a combination between two horizontal competitors designed to foreclose entry into the trading card market, that agreement was simply a collective renegotiation of all the players' individual licensing agreements with Topps. Its primary purpose was to increase the players' royalties under their prior license agreements. As such, the contract is more akin to a vertical licensor-licensee agreement than to a combination between horizontal competitors. Indeed, even to label the MLBPA, a labor union charged with negotiation of collective bargaining agreements, and Topps, a major bubble gum and novelty manufacturer, as competitors stretches the usefulness of the term.[20] In addition, licensing proposals in

is "fairly necessary" in the circumstances of the particular case, or whether the restriction "exceed[s] the outer limits of restraint reasonably necessary to protect the defendant." 521 F.2d at 1248–49 (footnotes omitted). See Bravman v. Bassett Furniture Industries, Inc., 552 F.2d 90, 102 (3d Cir.) cert. denied, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977). Cf. Consolidated Farmers Mutual Ins. Co. v. Anchor Savings Ass'n, 480 F.Supp. 640, 653 (D.Kan.1979) (mortgage institution's lending policies are reasonable and need not constitute least restrictive alternative).

19. These agreements included: 1970 license to Beatrice Foods for player likenesses on the boxes of Milk Duds Candy (Plaintiff's exhibit 74, App. at 952–53); 1970 license to ITT Continental Baking for the sale of trading cards with cookies; 1970–71 and 1974 license to Kellogg's Co. to sell pictures in a package of 54 baseball cards for $1.50 and a cereal box top (Plaintiff's exhibits 85, 87, 89, 137, 338); 1972–73 licenses to Madaras, Inc. and Pasco, Inc. of Winona, Minnesota, to sell baseball novelties, including picture packs (Joint App. at 520); Pro Star, Inc. of Canada, for 3½" × 5½" player postcards (Plaintiff's exhibit 123, Joint Appendix at 521); and 1973 license to Charles Linnett Associates to sell 4" × 6" pictures of players. (Plaintiff's exhibits 90–92; 94–95).

There was only one instance where the MLBPA did not accept a licensing proposal that was competitive to Topps. This occurred in 1974 with Michael Aronstein's proposal to market trading cards alone as a "collector set." This was a blatant interference with Topps' exclusive rights, and both Topps and the MLBPA informed Aronstein that no license would be issued. Aronstein continued to market his cards whereupon Topps obtained a preliminary injunction. The case ended in a settle-

ment that approved the publication of the cards already produced. (Plaintiff's exhibit 144). Topps' and the Association's joint protection of their exclusive contract rights is not proscribed by the antitrust laws. It is not a violation of the Sherman Act to institute a proper infringement action. See W. L. Gore & Assoc., Inc. v. Carlisle Corp., 529 F.2d 614 (3d Cir. 1976) (commencement of a good faith patent infringement suit does not constitute an antitrust violation).

20. Fleer contends that International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), involved a similar horizontal agreement in the promotion of championship boxing matches and hence controls this case. We disagree. International Boxing concerned a combination among the four largest promotors of championship fights to exclude any competition in the promotion of championship boxing. Prior to the agreement, the conspirators each controlled a separate stadium in one area of the country. After the agreement the combination controlled 93% of the championship fights for a two and one half year period. Because the defendants controlled all the national stadia, all competition was foreclosed. In the instant case, the MLBPA and Topps are licensor-licensee, not horizontal competitors. The relevant market in this case consists of bubble gum cards with a low cost premium. While Topps may control the sale of cards with gum, (but see text accompanying notes 16–18 surpa), it is the MLBPA, through the commercial association agreement, that handles the sale of trading cards with non-confectionary premiums and several of these competitive licenses have been granted to rival trading card products. Hence, the close knit market control of International Boxing is inapposite.

competition to Topps would not necessarily decrease the players' total royalty payments. While such competitive products might depress the sales of Topps trading cards, they would also generate license royalties of their own which, through the commercial authorization program, would go directly to the players. The net effect of such competition could have been to increase player royalties, through a larger number of licensed products.

The final section 1 issue before the district court was the MLBPA's rejection of Fleer's 1974 license proposal. Because the proposal called for the sale of player likenesses in 5″ × 7″ patches, Topps had a right of first refusal under the 1968 agreement. Topps decided to waive this right, but Joel Shorin cautioned Miller that such a product might not move well and might inhibit retailers from purchasing other baseball related products.

■ Initially, the executive board's decision to reject the Fleer proposal was unilateral. While the players may have considered the proposal's effect on their Topps royalties, there was no unity of purpose or common design in rejecting the proposal. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). In *Sweeney*, Judge Aldisert stated: "Unilateral action, no matter what its motivation, cannot violate § 1 . . . . The evidence must permit the inference that the alleged conspirators 'had a unity of purpose or a common design and understanding, or a meeting of the minds.'" *Id.* at 110–111 (citations omitted).

■ Secondly, as a licensor, the MLBPA is free to grant licenses to any competitor, or none at all. *W. L. Gore & Asso. Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir. 1976) ("The right to refuse to license is the essence of the patent holder's right . . . .") The MLBPA is free to consider income potential in making any licensing decisions. *LaSalle Street Press, Inc. v. McCormick &*

*Henderson, Inc.*, 445 F.2d 84, 95–96 (7th Cir. 1971) (patentee has right to "consider relevant factors affecting the patentee's business in determining to whom a license will be offered and the conditions upon which a license will be granted"). The Association's rejection of Fleer's proposal was a lawful exercise of its right to grant licenses in the players' best interest.

Taken individually, or even as an interlocking network, the agreements at issue do not rise to the level of a section 1 violation. There were several competitive licenses for trading cards with non-confectionary goods and ample opportunity for competitors to challenge Topps directly by contracting with minor league players or persuading major league players not to renew their present agreements with Topps. Finally, the rejection of Fleer's 1974 proposal was a lawful exercise of the Association's right to expand selectively its licenses over baseball products.

### B. Section 2 Claim

The district court found the Association and Topps liable for a section 2 violation "[f]or virtually the same reasons that the defendants have been found to have violated § 1 of the Sherman Act...." 501 F.Supp. at 511. Although the court did not make a finding as to whether appellants had the specific intent to monopolize, it ruled that a showing of specific intent is not required to sustain a conspiracy to monopolize claim where actual monopoly power is proven.[21] The court reasoned that such power existed in this case because appellants excluded all competition from the relevant market through a network of interlocking contracts. We disagree.

■■ Specific intent to monopolize the relevant market is a necessary element of conspiracy to monopolize. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953); *Carpet Seaming Tape Licensing v.*

---

**21.** As the district court specifically stated: "The parties have not sufficiently framed the question of specific intent to permit the court to make a reasoned determination as to wheth-

er it existed, but, in any event, the court holds that such a finding is not required in this case." *Fleer*, 501 F.Supp. at 511.

*Best Seam, Inc.*, 616 F.2d 1133, 1141 (9th Cir. 1980); *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643, 651 (E.D.Pa.1975), *aff'd* 565 F.2d 154 (3d Cir. 1977). Such intent may be inferred, however, from the proof of actual monopoly power. *American Tobacco Co. v. United States*, 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946); L. Sullivan, *Handbook of the Law of Antitrust* 133 (1977). Monopoly power consists of the ability to control prices or exclude competition from the relevant market. *United States v. Grinnell Corporation*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). The district court held that appellants did not have the ability to control the price of baseball trading cards.[22] Hence, in order to sustain the section 2 violation the district court must have found that appellants excluded all meaningful competition from the baseball trading card market. This is a mixed question of law and fact which is not governed by the "clearly erroneous" standard. We conclude that the district court erred.

■ As was discussed in reference to the section 1 claims, the contracts at issue did not foreclose competition in the relevant product market. In sales of trading cards with gum, rival manufacturers could compete against Topps for minor league player's licenses. That such a program might take five or six years before a product could be marketed is a reflection of the minor league farm system and does not mean competition was foreclosed. In sales of trading cards with non-confectionary low cost products Topps' exclusive licensing agreements had no effect. Indeed, the commercial authorization program of the MLBPA promoted competition in the non-

confectionary goods market. Individual manufacturers concluded one agreement with the Association, rather than chasing down hundreds of individual players. *See* note 19 and accompanying text *supra.*

The rejection of Fleer's 1974 proposal does not transform such a pro-competitive arrangement into a violation of the Sherman Act. Several non-confectionary product licenses have been issued by the Association since the inception of the commercial authorization program. The rejection of one proposal because, in the minds of the players' executive board, it might depress the overall sales of baseball products is not evidence of monopoly power. Rather, it reflects that not every opportunity for a publicity license must be used. The right to withhold and negotiate publicity selectively for economic gain is implicit in the very nature of the right of publicity. *Zacchini*, 433 U.S. at 575, 97 S.Ct. at 2857.

Because we hold that Topps and the MLBPA did not have the power to exclude all competition from the relevant market, we cannot sustain the district court's finding of a section 2 violation. Moreover, there is no record support for the court's finding of a section 1 violation. Therefore, we do not reach the injunction or damages issues. We will reverse the district court's judgment and remand the case with instructions to enter judgment for appellants.

---

**22.** Indeed, a study conducted by the Child Research Service, Inc. (Esserman Study) concluded that the demand for baseball trading cards was quite elastic. The study consisted of interviews with boys ages 7–12, conducted during successive weeks, outside of candy and convenience stores in three separate cities (Rochester, Cincinnati, and Minneapolis). During the first week of the study the price of Topps'

baseball cards was twenty cents. In the second week the price was raised to forty cents and baseball trading cards experienced an 88% decrease in sales. In the second week a large percentage of those boys who considered baseball cards but did not buy them, "bought something else instead," because the price was too high. Joint appendix at 432.